**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 14-1780

VLADIMIR ERNESTO ORTEGA OLIVA, a/k/a Vladimir Ernesto Ortega Olivia,

Petitioner,

v.

LORETTA E. LYNCH, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: September 15, 2015     Decided: November 25, 2015

Before WYNN and DIAZ, Circuit Judges, and DAVIS, Senior Circuit Judge.

Petition for review granted; order reversed in part, vacated in part, and remanded by published opinion. Judge Wynn wrote the opinion, in which Judge Diaz and Senior Judge Davis joined.

**ARGUED**: Jean Zhuang, UNIVERSITY OF VIRGINIA LAW SCHOOL, Charlottesville, Virginia, for Petitioner. Margaret Judson Perry, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF**: Stephen L. Braga, Attorney Director, Kelsey Bryan, Third Year Law Student, Rachel Wade, Third Year Law Student, Appellate Litigation Clinic, Doug Ford, Attorney Director, Sarah Allen, Third Year Law Student, Immigration Clinic, UNIVERSITY OF VIRGINIA LAW SCHOOL, Charlottesville, Virginia, for Petitioner. Joyce R. Branda, Acting Assistant

Attorney General, Michelle LaTour, Deputy Director, Office of Immigration Litigation, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

---

WYNN, Circuit Judge:

Vladimir Ernesto Ortega Oliva, a native and citizen of El Salvador, sought asylum and withholding of removal under the Immigration and Nationality Act ("INA"). The Board of Immigration Appeals ("BIA") denied his petition, affirming the immigration judge's ("IJ's") determination that Oliva did not demonstrate a nexus between the persecution he faced and either of his proposed particular social groups. The BIA further held that even if Oliva had demonstrated the required nexus, he did not allege membership in a cognizable particular social group.

We conclude that the BIA erred by interpreting the nexus requirement too narrowly, and that Oliva successfully demonstrated that membership in his proposed social groups was at least one central reason for his persecution. We further conclude that the BIA failed to adequately address the record evidence in making its determination that Oliva's proposed social groups were not cognizable under the INA. Accordingly, we grant Oliva's petition, reverse in part, vacate in part, and remand for proper consideration of the cognizable social group issue.

I.

The facts of this matter show that Oliva left his home country of El Salvador and entered the United States without authorization in 2007. In July 2010, the Department of Homeland

3

Security served Oliva with a Notice to Appear, charging him with removability under section 212(a)(6)(A)(i) of the INA, as an alien present in the United States without admission or parole. In July 2011, Oliva filed an application for asylum and withholding of removal.

In 2013, the IJ held a hearing to assess Oliva's application. In his testimony and affidavit, Oliva explained that at the age of sixteen he joined a gang called Mara Salvatrucha, also known as MS-13, while living in San Rafael Cedros in El Salvador.[1] He was trained to spy for MS-13 in the territory of rival gangs.

When he was sixteen or seventeen years old, Oliva witnessed members of MS-13 brutally murder and dismember a rival gang member. After seeing this, Oliva decided to distance himself from the gang.

MS-13 forbids its members from quitting and kills anyone who attempts to leave the gang. However, MS-13 does allow gang members to become "inactive" members if they either devote themselves to the church or get married and start a family. MS-13 requires inactive members to pay "rent," a form of monetary tribute to the gang. A.R. 130. This ensures that inactive

---

[1] The IJ found Oliva to be a credible witness, which means that his testimony alone "may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 1208.16(c)(2).

4

members contribute financially to the gang, even if they no longer contribute physically.

Oliva began distancing himself from the gang and became more involved in his church. When MS-13 noted his increased absence from gang activities, gang members started to threaten Oliva. To escape MS-13, Oliva moved to live with his aunt in Lourdes Colon, El Salvador, but found that gangs were active there as well. After about three months in Lourdes Colon, Oliva moved to San Salvador, the capital of El Salvador, where he stayed with his godmother for roughly two years.

Around late 1997 or early 1998, Oliva returned to San Rafael Cedros but tried to stay hidden from MS-13. About a month after his return, the gang realized he was there. According to Oliva, the gang "reminded [him] that leaving the gang was not allowed, and threatened to kill [him] if [he] did not start paying them 'rent.'" A.R. 215. After that, Oliva paid roughly thirty percent of his income to the gang for seven or eight years.

In 2006, Oliva decided to stop paying rent, and on one occasion ran from MS-13 gang members to avoid having to pay. About two months later, in October 2006, members of MS-13 severely beat Oliva to send a message "that if [he] didn't continue paying the rent" he would be killed. A.R. 136. After the beating, Oliva began paying the rent again, and MS-13 "would

5

remind [him] of the rules when they took [his] money." A.R. 217. Oliva decided to flee to America to protect himself.

Oliva entered the United States without authorization in 2007 and settled down in Virginia. In the summer of 2011, he began receiving threatening phone calls originating in El Salvador. The callers told Oliva that if he "cross[es] the border back into El Salvador they will kill [him] as a punishment for trying to quit." A.R. 221.

Despite finding this testimony credible, the IJ denied Oliva's application for asylum and withholding of removal.[2] The IJ found that "[t]he evidence indicates that the gang was not targeting [Oliva] because of his membership in a group consisting of former gang members who have either found religion or started families . . . . Rather, he was targeted for money." A.R. 96.

Oliva appealed the IJ's decision. A one-member panel of the BIA dismissed the appeal.

---

[2] The IJ determined that Oliva was not entitled to asylum because he did not qualify for an exception to the one-year filing deadline for asylum applications. However, this issue is not before us because the BIA did not address it. Instead, the BIA determined that even if Oliva had filed his application in time, he did not establish eligibility for asylum because he did not demonstrate his membership in a cognizable particular social group. See infra note 3.

II.

The courts of appeals have jurisdiction to review final orders of removal. 8 U.S.C. § 1252(a)(1); Martinez v. Holder, 740 F.3d 902, 908 (4th Cir. 2014). In this case, the final order of removal was issued by the BIA. See 8 U.S.C. § 1101(a)(47)(B)(i); Martinez, 740 F.3d at 908. We may affirm the BIA only on the grounds stated in the opinion and may not substitute what we consider to be "a more adequate or proper basis" for its conclusions. Crespin-Valladares v. Holder, 632 F.3d 117, 123 (4th Cir. 2011) (quoting SEC v. Chenery Corp., 332 U.S. 194, 196 (1947)).

"[A] decision that an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C). We review the BIA's legal determinations de novo. Martinez, 740 F.3d at 909. While a three-member panel of the BIA is entitled to Chevron deference for its reasonable interpretations of immigration statutes, a one-member panel of the BIA—like the one in this case—is entitled to the lesser Skidmore deference. Id. at 909–10; see Skidmore v. Swift & Co., 323 U.S. 134, 139–40 (1944). In other words, the opinion of the one-member panel of the BIA is not controlling upon this Court, but we may consider it as "a body of experience and informed judgment," taking into account "the thoroughness evident in its consideration, the validity of its

7

reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade." Skidmore, 323 U.S. at 140.

The BIA's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see also Temu v. Holder, 740 F.3d 887, 891 (4th Cir. 2014) ("We uphold factual findings unless no rational factfinder could agree with the BIA's position." (citing Crespin-Valladares, 632 F.3d at 124)). The BIA itself reviews findings of fact made by the IJ for clear error. See Crespin-Valladares, 632 F.3d at 127 (citing 8 C.F.R. § 1003.1(d)(3)(i)).

### III.

While Oliva concedes that he is eligible for removal, he contends that the BIA erred in denying his request for withholding of removal under section 241(b)(3)(A) of the INA. Under that section, the Attorney General may not remove an alien who is otherwise removable "if the Attorney General decides that the alien's life or freedom would be threatened in [the country of removal] because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).[3]

---

[3] Similarly, asylum may be granted if the Attorney General determines that an alien has established "that race, religion,

Oliva argues that his life would be threatened because of his membership in one of two particular social groups: (1) "Salvadorans who are former members of MS-13 and who left the gang, without its permission, for moral and religious reasons," and (2) "Salvadorans who were recruited to be members of MS-13 as children and who left the gang as minors, without its permission, for moral and religious reasons." A.R. 3.

The BIA dismissed Oliva's appeal on two grounds. First, the BIA held that Oliva's proposed particular social groups were not cognizable under the INA. Second, the BIA found that Oliva failed to demonstrate that the persecution he feared was on account of his membership in either of his proposed social groups—the nexus requirement. Oliva challenges both determinations on appeal.

A.

If the BIA correctly held that Oliva failed to establish a nexus between his persecution and his proposed social groups, the Court could affirm the BIA's decision without reaching the

nationality, membership in a particular social group, or political opinion was or will be at least one central reason for persecuting the applicant." 8 U.S.C. § 1158(b)(1)(B)(i). Because both asylum and withholding of removal claims rely on the same factual basis, we may look to asylum cases when deciding whether a petitioner has asserted a valid particular social group or shown the required nexus in his application for withholding of removal. See Ai Hua Chen v. Holder, 742 F.3d 171, 184 (4th Cir. 2014) (noting that "the facts that must be proved are the same" for both claims, although the burden of proof is higher for withholding of removal).

question whether his particular social groups are cognizable under the INA. See Cordova v. Holder, 759 F.3d 332, 339 (4th Cir. 2014). Therefore, we begin our analysis by considering whether Oliva satisfied the nexus requirement.

An applicant must satisfy the nexus requirement by showing his past or threatened persecution was "on account of" his membership in that group. 8 U.S.C. § 1101(a)(42)(A). Oliva argues that the BIA committed reversible error in holding that he had failed to demonstrate the "on account of" prong. We agree.

A petitioner must show that his membership in the particular social group "was or will be a central reason for his persecution." Matter of W-G-R-, 26 I. & N. Dec. 208, 224 (B.I.A. 2014) (emphasis added). Stated differently, a protected ground must be "'at least one central reason for' the feared persecution" but need not be the only reason. Crespin-Valladares, 632 F.3d at 127 (quoting 8 U.S.C. § 1158(b)(1)(B)(i)). Membership in a protected social group may not, however, be merely "incidental, tangential, superficial, or subordinate to another reason for harm." Quinteros-Mendoza v. Holder, 556 F.3d 159, 164 (4th Cir. 2009) (quoting In Re J-B-N-, 24 I. & N. Dec. 208, 214 (B.I.A. 2007)).

The BIA determined Oliva's fear of persecution was not on account of his becoming an inactive gang member, but because of

10

"his specific conduct of violating the [gang's] rules"—namely refusing to pay rent. A.R. 6 (citing W-G-R-, 26 I. & N. at 224). This was an overly restrictive view of Oliva's case. A close examination of the record illuminates the inextricable relationship between Oliva's membership in his proposed social groups and his refusal to pay rent.

Extortion itself can constitute persecution, even if the targeted individual will be physically harmed only upon failure to pay. See Mirisawo v. Holder, 599 F.3d 391, 396 (4th Cir. 2010) ("While 'persecution' is often manifested in physical violence, 'the harm or suffering [amounting to persecution] need not be physical, but may take other forms,' so long as the harm is of sufficient severity." (alteration in original) (quoting H.R. Rep. No 95-1452, at 5 (1978), reprinted in 1978 U.S.C.C.A.N. 4700, 4704)); Jahed v. INS, 356 F.3d 991, 998–99 (9th Cir. 2004). Recognizing that extortion can be a form of persecution, the appropriate inquiry is thus whether the extortion occurred on account of protected grounds. See, e.g., Aliyev v. Mukasey, 549 F.3d 111, 117–18 (2d Cir. 2008) (holding that the BIA erred in finding that the petitioner's extortion was not on account of his ethnicity when the persecutors made comments about the petitioner's ethnic background); Desir v. Ilchert, 840 F.2d 723, 727-28 (9th Cir. 1988) (finding that extortion, backed up with physical violence, was on account of

11

both the petitioner's political beliefs and the personal greed of the persecutor); cf. Quinteros-Mendoza, 556 F.3d at 164-65 (finding no evidence that gang extortion was on account of a protected ground).

Here, MS-13's threats and demands for rent were part of the persecution Oliva faced and not, for example, a mere precursor to his persecution. Because it is undisputed that MS-13 extorted Oliva on account of his leaving the gang, the record compels the conclusion that his persecution was on account of his status as a former member of MS-13.

Moreover, persecution may be on account of multiple central reasons or intertwined central reasons, and we have found so before. For example, in Hernandez-Avalos v. Lynch, the petitioner, a citizen of El Salvador, was threatened by the Mara 18 gang when she refused to let the gang recruit her twelve-year-old son. 784 F.3d 944, 947 (4th Cir. 2015). The petitioner claimed that her persecution was on account of her membership in a particular social group—her nuclear family. Id. at 949. The BIA held that the threats were on account of her refusing to allow her son to engage in criminal activity, not on account of her family membership. Id. This Court deemed the BIA's view manifestly contrary to law and grounded in "an excessively narrow reading" of the nexus requirement. Id. We held that "Hernandez's relationship to her son is why she, and

12

not another person, was threatened with death if she did not allow him to join Mara 18," and that "[t]he BIA's conclusion that these threats were directed at her not because she is his mother but because she exercises control over her son's activities draws a meaningless distinction." Id. at 950.

Similarly, in Temu v. Holder, we analyzed the nexus requirement not by focusing myopically on a particular word or fact but rather by viewing the case holistically, with an eye to the full factual context. 740 F.3d at 891–92. The petitioner claimed that he was persecuted because of membership in a group of "individuals with bipolar disorder who exhibit erratic behavior." Id. at 891. Although the BIA found that Temu was beaten for being mentally ill and behaving erratically, it nevertheless held that his persecution was not on account of his bipolar disorder specifically. Id. at 891–92. We reversed, holding that no reasonable factfinder could have reached that conclusion and noting that "to reconcile [the BIA's] conflicting findings . . . would demand logical acrobatics." Id. at 892.

Here, as in Hernandez and Temu, Oliva presented compelling evidence that the gang did not demand money just for the sake of personal greed or as a random act of violence, but targeted him specifically because "leaving the gang was not allowed" unless he paid rent, A.R. 215, and those were "the rules for people who are not active members," A.R. 217. The BIA acknowledged that

13

"gang members began to threaten [Oliva] for 'rent' <u>because he was recognized as a former gang member</u> who no longer participated in gang activities and did not make payments while living elsewhere." A.R. 4 (emphasis added).

Nevertheless, the BIA drew too fine a distinction between Oliva's status as a former member of MS-13 and the threats to kill him for breaking the rules imposed on former members. While it is true that Oliva's decision to stop paying rent—like Hernandez's decision to resist gang recruitment efforts—was the immediate trigger for the gang's brutal assault on Oliva, it was Oliva's status as a former gang member that led MS-13 to demand rent in the first place and to assault him for failure to pay it. See Hernandez, 784 F.3d at 950.

Finally, the BIA found no connection between the persecution Oliva faced and the fact that he left the gang "for moral or religious reasons." A.R. 6. However, the fact that Oliva left the gang for moral and religious reasons places him in the category of former gang members that are required to pay rent. Thus, the fact that he left MS-13 for moral and religious reasons is not merely "incidental, tangential, superficial, or subordinate" to his refusal to pay. Quinteros-Mendoza, 556 F.3d at 164. Rather, it was a central reason for his persecution.[4]

_____

[4] We note that the BIA often requires petitioners to add modifiers onto their social group definition to meet the

14

Even given the deferential standard of review, we conclude that Oliva faced persecution on account of his membership in a group of Salvadorans who are former members of MS-13 and who left the gang, without its permission, for moral and religious reasons.

B.

Having found that Oliva satisfied the nexus requirement, we now must consider whether Oliva asserted a cognizable particular social group. The BIA has held that a particular social group is cognizable under the INA if the group is: "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." Matter of M-E-V-G-, 26 I. & N. Dec. 227, 237 (B.I.A. 2014).

The BIA did not reach the immutability or particularity prongs because it held that Oliva's proposed social groups failed the social distinction requirement. To be socially

_____

particularity requirement. See W-G-R-, 26 I. & N. Dec. at 221–22 (rejecting a proposed social group consisting of former members of the Mara 18 gang, because "when a former association is the immutable characteristic that defines a proposed group, the group will often need to be further defined" with modifiers, such as the duration of the individuals' membership and the recency of their participation). Requiring each modifier to be an independent, central reason for the persecution could make it nearly impossible for petitioners to successfully navigate the legal requirements for asylum and withholding of removal. And nothing suggests that there must be a word-for-word match between the group definition and the motivation of the persecutors. See Temu, 740 F.3d at 891–92.

15

distinct, a group must be "perceived as a group by society." Id. at 240.  The BIA determined that "[t]he record contains little evidence that Salvadoran society perceives individuals 'who left the [MS-13], without its permission,' under either of the two sets of proposed circumstances, as a distinct social group."  A.R. 5 (second alteration in original).

The BIA stated that Oliva "has identified only one example" to show social distinction: his assertion that former gang members suffer employment discrimination.  A.R. 5.  The BIA found this example to be insufficient, indicating that it was not clear from the record that the discrimination was specifically tied to status as a former gang member.

However, the BIA failed to address any of the other evidence that Oliva put forth, including evidence of government- and community-driven programs to help former gang members rehabilitate themselves and an affidavit from a community organizer who stated that former gang members who leave the gang for religious reasons become seriously and visibly involved in churches.  The parties agree that the BIA erred in failing to address Oliva's other evidence.  Indeed, the government concedes that the proper course of action is to remand to the BIA for consideration of the unaddressed evidence.  Appellee's Br. at 47–50.

"[W]hen a BIA order does not demonstrate that the agency has considered an issue, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" Cordova, 759 F.3d at 338 (quoting Nken v. Holder, 585 F.3d 818, 822 (4th Cir. 2009)). Because the BIA order here fails to show that the agency adequately considered this issue, we remand.

IV.

In sum, we hold that Oliva established a nexus between his proposed social groups and the persecution he faced. The success of Oliva's petition thus depends on whether either of his proposed social groups is cognizable. In determining that Oliva had not alleged a cognizable particular social group, the BIA failed to adequately address Oliva's evidence. Accordingly, we grant Oliva's petition for review, reverse the BIA's determination on nexus, and remand this matter to the BIA for consideration of whether Oliva's proposed social groups are cognizable in light of all of the relevant evidence.

PETITION FOR REVIEW GRANTED;
ORDER REVERSED IN PART,
VACATED IN PART, AND REMANDED

17