**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1034**

GERMAN ALEXANDER NOLASCO, a/k/a German Chavez, a/k/a Alex Nolasco, a/k/a Goofie,

    Petitioner,

  v.

MERRICK B. GARLAND, Attorney General,

    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: May 6, 2021           Decided: August 2, 2021

Before NIEMEYER, FLOYD, and RUSHING, Circuit Judges.

Petition for review denied by published opinion. Judge Rushing wrote the opinion, in which Judge Niemeyer and Judge Floyd joined.

**ARGUED:** Jasmin Tohidi, TOHIDI LAW OFFICE PLLC, Falls Church, Virginia, for Petitioner. Stephen Philip Finn, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Joseph H. Hunt, Assistant Attorney General, Mary Jane Candaux, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

RUSHING, Circuit Judge:

German Alexander Nolasco, a native and citizen of El Salvador, petitions for review of a final order of the Board of Immigration Appeals (BIA) denying his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (CAT). Nolasco claims that he fears persecution by the gangs and police of El Salvador on account of his status as a former member of the MS-13 gang. For the reasons explained below, we deny the petition.

## I.

Nolasco entered the United States without authorization in 1998, when he was five or six years old. After Nolasco was arrested for assault in April 2019, the Department of Homeland Security (DHS) charged him with being "an alien present in the United States without being admitted or paroled, or who arrived in the United States at any time or place other than as designated by the Attorney General," in violation of 8 U.S.C. § 1182(a)(6)(A)(i). Nolasco admitted the charge and applied for asylum, withholding of removal, and CAT relief. *See* 8 U.S.C. §§ 1158, 1231(b)(3); 8 C.F.R. §§ 1208.16(c), 1208.18.

At a hearing before the immigration judge (IJ), Nolasco testified that he fears returning to El Salvador because of his former membership in the MS-13 gang. Nolasco was a member of MS-13 in Vienna, Virginia, from approximately 2006 to 2010. He left the gang when he completed a juvenile diversion program and moved to a more rural part of Virginia. But Nolasco's body still bears tattoos identifying him as a gang member: three

2

dots on his hand; his gang nickname "Goofie" (spelled "GOOF13" to symbolize MS-13); "gangster love" on his forearms; "laugh now cry later masks"; the numbers "1" and "3" on his left and right upper arm; and the area code "213" on his back (representing Los Angeles, MS-13's founding location). Nolasco fears that gangs and police in El Salvador will perceive him to be a member of MS-13 because of his tattoos, which he cannot fully cover even with long sleeves. Nolasco also contends that "[t]he United States will share [his] criminal history with the government of El Salvador," which will allow authorities to identify and target him as a former gang member. A.R. 187. He submitted news articles and various country reports about the violence perpetrated by and against gang members in El Salvador, as well as the Department of State Human Rights Report for El Salvador (State Department Report). He also testified to his belief, based on accounts from former gang members he met in detention, that Salvadoran police torture and kill suspected gang members.

The IJ denied Nolasco's application and ordered him removed to El Salvador. As relevant to his asylum and withholding claims here, the IJ found that Nolasco's proposed particular social groups—(1) former members of MS-13 and (2) former members of MS-13 who leave for moral reasons—did not satisfy the particularity and social-distinction requirements necessary to state a cognizable particular social group.[1] The IJ also found that Nolasco's evidence did not show he would more likely than not be identified as a gang member and tortured if removed to El Salvador and so denied CAT relief.

---

[1] The IJ also found that Nolasco failed to establish a well-founded fear of future persecution and that his asylum application was untimely.

3

Nolasco appealed to the BIA, which affirmed the IJ in a single-member opinion. Regarding asylum and withholding of removal, the BIA agreed with the IJ that the proposed particular social groups lacked particularity because they were overbroad and lacked social distinction because Nolasco had failed to show that former gang members are recognized as a distinct group in Salvadoran society. A.R. 4 (citing *Matter of M-E-V-G-*, 26 I. & N. Dec. 227 (BIA 2014); *Matter of W-G-R-*, 26 I. & N. Dec. 208 (BIA 2014)). As for CAT relief, the BIA observed that the IJ considered "the risk of torture from both gang members and the Salvadoran police" in the aggregate and determined that Nolasco "did not establish a clear probability of torture." A.R. 5. The BIA also reasoned from the State Department Report that, although "corruption and violence remain[] a problem in El Salvador," the Salvadoran government has implemented "programs to combat . . . police corruption . . . [and] gang violence." A.R. 5.

## II.

We have jurisdiction to review the BIA's final order of removal pursuant to 8 U.S.C. § 1252(a)(1). When the BIA "adopts and affirms the IJ's decision and supplements it with its own opinion, we review both decisions." *Cordova v. Holder*, 759 F.3d 332, 337 (4th Cir. 2014); *see also Martinez v. Holder*, 740 F.3d 902, 908 n.1 (4th Cir. 2014), *as amended* (Jan. 27, 2014). But where, as here, the BIA adopts only a portion of the IJ's analysis, "we limit our consideration of the IJ's opinion to the portions that have been adopted and incorporated into the [BIA's] decision." *Arita-Deras v. Wilkinson*, 990 F.3d 350, 356 (4th Cir. 2021).

4

The BIA's decision that "an alien is not eligible for admission to the United States is conclusive unless manifestly contrary to law." 8 U.S.C. § 1252(b)(4)(C); *see also id.* § 1252(b)(4)(D); *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). We review legal conclusions de novo, "affording appropriate deference to the BIA's interpretation of the [Immigration and Nationality Act] and any attendant regulations." *Li Fang Lin v. Mukasey*, 517 F.3d 685, 691–692 (4th Cir. 2008). We review factual findings for substantial evidence, treating them as "conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992); *Cordova*, 759 F.3d at 337. In reviewing for substantial evidence, we ask whether the administrative record, considered as a whole, "contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see also Tassi*, 660 F.3d at 719. Thus, "even if the record plausibly could support two results," reversal is appropriate only where the evidence "not only supports [the petitioner's] conclusion, but *compels* it." *Tang v. Lynch*, 840 F.3d 176, 180 (4th Cir. 2016) (original alterations omitted) (quoting *Mulyani v. Holder*, 771 F.3d 190, 197 (4th Cir. 2014)). Finally, the agency "abuses its discretion if it fails to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Cordova*, 759 F.3d at 337 (internal quotation marks omitted).

## III.

We first consider Nolasco's challenge to the denial of his application for asylum and withholding of removal. The Immigration and Nationality Act (INA) authorizes the

5

Attorney General and the Secretary of Homeland Security, in their discretion, to grant asylum to any "refugee." 8 U.S.C. § 1158 (b)(1)(A). To qualify as a refugee, an applicant must demonstrate that he "is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, [his native] country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1101(a)(42)(A); *see also id.* § 1158(b)(1)(B)(i) ("The burden of proof is on the applicant to establish that the applicant is a refugee."). The INA further requires the Attorney General to withhold removal of an applicant who shows that his "life or freedom would be threatened in [the proposed country of removal] because of [his] race, religion, nationality, membership in a particular social group, or political opinion." *Id*. § 1231(b)(3)(A); *see also Lizama v. Holder*, 629 F.3d 440, 446 & n.3 (4th Cir. 2011). "Because withholding of removal is mandatory if the alien meets the standard of proof," *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009), the applicant "must show a 'clear probability of persecution' on account of a protected ground," as opposed to the lower burden for asylum of showing a well-founded fear of persecution, *Djadjou v. Holder*, 662 F.3d 265, 272 (4th Cir. 2011) (quoting *INS v. Stevic*, 467 U.S. 407, 430 (1984)). Thus, if an applicant cannot demonstrate asylum eligibility, his application for withholding of removal "will necessarily fail as well." *Id.*

The BIA concluded that Nolasco was not eligible for asylum because he failed to demonstrate membership in a cognizable "particular social group."[2] "The [INA] does not define 'particular social group,' and there is little legislative history on the matter." *Martinez*, 740 F.3d at 910; *see also Fatin v. INS*, 12 F.3d 1233, 1238 (3d Cir. 1993). The BIA, however, has defined the requirements of a particular social group, and we "defer to [its] reasonable interpretation of the term." *Lizama*, 629 F.3d at 446.

Concerned that "the social group concept would virtually swallow the entire refugee definition if common characteristics, coupled with a meaningful level of harm, were all that need be shown," *Matter of M-E-V-G-*, 26 I. & N. Dec. at 231 (internal quotation marks omitted), the BIA has endeavored to construe "membership in a particular social group" in accord with the other limited grounds of persecution listed in the Act, *id.* at 230; *see also Matter of Acosta* 19 I. & N. Dec. 211, 233–234 (1985). Thus, an applicant for asylum or withholding of removal seeking relief based on membership in a particular social group must establish "that the group is (1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 237; *see also Quintero v. Garland*, 998 F.3d 612, 632 (4th Cir. 2021) (observing that this Court has adopted *M-E-V-*

---

[2] The IJ also found that Nolasco failed to show a well-founded fear of future persecution, which Nolasco contests on appeal. But the BIA did not adopt or affirm that aspect of the IJ's decision; therefore, we lack jurisdiction to review it. *See* 8 U.S.C. § 1252(a)(1) (limiting this Court's jurisdiction to final orders of removal); *Amaya v. Rosen*, 986 F.3d 424, 429 (4th Cir. 2021), *as amended* (Apr. 12, 2021) ("[T]his Court may only reach issues decided by the BIA.").

*G-*'s three-part test).  The parties here dispute only the social-distinction requirement, so we cabin our review accordingly.[3]

"Social distinction refers to social recognition" and requires that the group be "perceived within the given society as a sufficiently distinct group."  *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238, 240.  To qualify, the particular social group must be perceived by society as a whole, not solely by the group's alleged persecutors.  *See id*. at 242; *Matter of W-G-R-*, 26 I. & N. Dec. at 218; *Santos Mejia v. Sessions*, 717 Fed. App. 257, 260 (4th Cir. 2018).  Perception in this context does not require ocular visibility:  "[s]ociety can consider persons to comprise a group without being able to identify the group's members on sight."  *Matter of M-E-V-G-*, 26 I. & N. Dec. at 240.  But there must be evidence that society in general commonly considers persons sharing the particular characteristic to be a group.  *Matter of W-G-R-*, 26 I. & N. Dec. at 217.  And members of the group must be "set apart, or distinct, from other persons within the society in some significant way."  *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238.  "Evidence such as country conditions reports, expert witness testimony, and press accounts of discriminatory laws and policies, historical animosities, and the like may establish that a group exists and is perceived as 'distinct' or 'other' in a particular society."  *Id*. at 244.

Nolasco contends that the BIA erred in affirming the IJ's conclusion that his proposed social groups—former members of MS-13 and former members of MS-13 who

---

[3] The BIA held that Nolasco's proposed groups lacked social distinction and particularity.  But after this Court's recent decision in *Amaya v. Rosen*, 986 F.3d 424 (4th Cir. 2021), *as amended* (Apr. 12, 2021), the Government no longer defends the BIA's particularity ruling.

leave for moral reasons—were not socially distinct. He challenges this conclusion on three grounds. First, he contends that the agency "erred as a matter of law in focusing on whether [he] was outwardly visible as a former gang member rather than whether his proposed group is distinct within Salvadoran society." Opening Br. 20. Second, he claims the agency "failed to consider the entirety of the documentary evidence demonstrating social distinction." *Id*. at 21. Third, he argues that the agency "did not give sufficient weight to the documentary evidence" it did consider. *Id*. at 22. We address each argument in turn.

A.

Whether the agency employed the correct standard for social distinction is a question of law we review de novo. *See Amaya*, 986 F.3d at 429. Nolasco contends that the IJ conflated social distinction with literal visibility by focusing on whether his tattoos would identify him as a former gang member. *See Matter of M-E-V-G-*, 26 I. & N. Dec. at 238 ("Literal or 'ocular' visibility is not, and never has been, a prerequisite for a viable particular social group."). The record does not support Nolasco's contention.

To begin, Nolasco does not identify any purported error in the social-distinction standard applied by the BIA in its order, which is the decision under review. *See Arita-Deras*, 990 F.3d at 356 ("[W]e limit our consideration of the IJ's opinion to the portions that have been adopted and incorporated into the [BIA's] decision."). The BIA agreed with the IJ that Nolasco's proposed groups do not satisfy the social-distinction test "because [he] has not shown that gang members who have renounced their gang membership are recognized in Salvadoran society to be a distinct group." A.R. 4 (citing *Matter of M-E-V-*

9

*G-*, 26 I. & N. Dec. 227; *Matter of W-G-R-*, 26 I. & N. Dec. 208). That is the correct standard.

Even looking through the BIA's order to the IJ's social-distinction analysis, however, the IJ did not apply the wrong standard. The IJ correctly stated that the relevant inquiry was whether "society in El Salvador recognizes former gang members as a group." A.R. 96; *see also* A.R. 95 (concluding that "former members of MS-13 or former members of MS-13 who leave for moral reasons are [not] socially distinct within society . . . in El Salvador"). In answering that question, the IJ noted evidence about "rehabilitation efforts within El Salvador to protect former gang members," which "would arguably show that some people are thinking of former gang members as a group." A.R. 96. Although the IJ referred to Nolasco's repeated testimony that his tattoos would identify him as a former gang member, it did not employ a literal visibility standard for social distinction. We reject Nolasco's first claim of error.

## B.

As for his second contention, the record does not support Nolasco's claim that the IJ failed to consider the documentary evidence in assessing whether his proposed social groups were cognizable. To the contrary, the IJ made clear reference to documents submitted by Nolasco and DHS. For example, the IJ discussed evidence concerning efforts by some groups in El Salvador "to rehabilitate former gang members or help people come out of gangs," and "a few articles [in the record] where police noticed that somebody had been a former gang member or a gang member because of seeing their tattoos." A.R. 96, 97–98. Nolasco ignores the IJ's attention to "evidence on the record of the problem with

10

violent gangs" and "the government's crackdown on those violent crimes," including the IJ's specific reference to country reports, the State Department Report, and "articles showing the problems between the gangs and the country's police." A.R. 97–98.

This case is therefore quite unlike *Oliva v. Lynch*, where the BIA wrongly stated that the petitioner had "identified only one example" of social distinction. 807 F.3d 53, 61 (4th Cir. 2015). There, all parties acknowledged that "the BIA failed to address any of the other evidence that [the petitioner] put forth, including evidence of government-and community-driven programs to help former gang members rehabilitate themselves and an affidavit from a community organizer who stated that former gang members who leave the gang for religious reasons become seriously and visibly involved in churches." *Id*. Here, by contrast, the agency did address Nolasco's evidence. His effort to liken his petition to our decision in *Oliva* falls flat.

C.

Lastly, Nolasco's argument that the IJ (and, by extension, the BIA) did not "give sufficient weight to the documentary evidence demonstrating social distinction" misstates our standard of review and lacks merit. Opening Br. 22; *see id.* (requesting reversal on this ground). Whether Salvadoran society views former MS-13 members or former MS-13 members who left for moral reasons as socially distinct is a question of fact we review only for substantial evidence. *See Cordova*, 759 F.3d at 337. "We may not reweigh the evidence," *Tang*, 840 F.3d at 180, and must uphold the agency's factual findings "unless any reasonable adjudicator would be compelled to conclude to the contrary," 8 U.S.C.

11

§ 1252(b)(4)(B); *see also Temu v. Holder*, 740 F.3d 887, 891 (4th Cir. 2014) ("We uphold factual findings unless no rational factfinder could agree with the BIA's position.").

Much of the record evidence concerns violence committed by gangs in El Salvador to prevent members from leaving their ranks, police violence against gang members, and efforts by the Salvadoran government to track and monitor deported gang members returning to El Salvador. This evidence does not meaningfully distinguish between former members of MS-13 and active gang members. We are mindful, moreover, that group recognition must be determined by the perception of society as a whole, rather than "solely by the perception of an applicant's persecutors." *Matter of W-G-R-*, 26 I. & N. Dec. at 218; *see also Matter of M-E-V-G-*, 26 I. & N. Dec. at 242. Nolasco highlights an article about one member of a different gang, Barrio 18, who left the gang because of his conversion to Christianity. As the IJ noted, the fact that some religious groups conduct rehabilitation programs to assist former gang members "arguably show[s] that some people are thinking of former gang members as a group." A.R. 96. But the same article also stresses "a colloquial belief in Salvadoran society that gang members are people forever ruined" because they never stop being part of the gang and therefore "can't retire," suggesting a lack of distinction between active and former members. A.R. 420. Similarly, articles and reports that in general terms mention efforts to extricate gang members say little about whether society views former gang members as "set apart, or distinct, from other persons within the society in some significant way." *Matter of M-E-V-G-*, 26 I. & N. Dec. at 238.

12

Viewed as a whole, the administrative record does not compel a finding that Salvadoran society views former MS-13 members or former MS-13 members who left for moral reasons as socially distinct. We therefore may not disturb the agency's determination.

IV.

We turn now to the BIA's denial of Nolasco's application for protection from removal under CAT. An applicant seeking CAT relief bears the burden to prove that "it is more likely than not that he will be tortured if removed" and "that this torture will occur at the hands of government or with the consent or acquiescence of government." *Martinez*, 740 F.3d at 914 (emphasis and internal quotation marks omitted); *see* 8 C.F.R. § 1208.16(c)(2). A public official acquiesces in torture if he or she is aware, either by actual knowledge or willful blindness, of the activity constituting torture beforehand and "thereafter breach[es] his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7). When an applicant claims a fear of torture from multiple entities, the agency must assess the likelihood of torture by aggregating the risk from all sources. *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 972 (4th Cir. 2019).

Here, both the IJ and the BIA assessed the likelihood of torture from Salvadoran authorities and gangs in the aggregate and found that Nolasco did not show it was more likely than not he would be tortured if removed to El Salvador. The IJ acknowledged the chronic violence in El Salvador, including "allegations of unlawful killings of suspected gang members and others by security forces," but also noted that the State Department Report indicates "El Salvador is investigating and prosecuting corruption when it can."

13

A.R. 100. The BIA affirmed the IJ's analysis, concluding that, "given the Salvadoran government's implementation of programs to combat not only police corruption, but also gang violence, [Nolasco] has not met his burden to demonstrate that he faces a clear probability of torture if he returns to El Salvador." A.R. 5.

## A.

In his petition for review, Nolasco first claims that the agency arbitrarily ignored evidence relevant to his CAT claim. "We presume that, in reaching [their] conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence." *Martinez*, 740 F.3d at 914. The BIA and IJ "are not required to discuss every piece of evidence in the record, but they must announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Ai Hua Chen v. Holder*, 742 F.3d 171, 179 (4th Cir. 2014) (original alteration and internal quotation marks omitted).

Contrary to Nolasco's claim, the IJ and BIA specifically addressed some of the evidence he contends they ignored. The IJ discussed the content of both the State Department Report and the Intercept article about a Barrio 18 member who attempted to leave the gang. The BIA similarly refenced country-conditions evidence.

As for the other documents Nolasco highlights, he presents nothing to rebut the presumption that the agency considered that evidence to the extent it was relevant. *See Rodriguez-Arias*, 915 F.3d at 974 (noting that the agency abuses its discretion when it arbitrarily ignores "legally significant evidence" (internal quotation marks omitted)). The academic studies and news articles Nolasco emphasizes simply reiterate the allegations of

14

unlawful violence against suspected gang members and government corruption that the IJ explicitly acknowledged. Documents describing information sharing between the United States and El Salvador and the nation's deportee criminal registry show that El Salvador has access to information about deported gang members but do not recount any abuses related to the programs. Given their discussion of the more relevant sources in the record, it is apparent that the IJ and BIA thoughtfully considered the evidence before them in issuing their decisions. We discern no abuse of discretion.

B.

Nolasco also asserts that the BIA improperly denied his claim for CAT relief. We review for substantial evidence the BIA's finding that Nolasco has not shown it is more likely than not he will be tortured if removed to El Salvador. *See Mulyani*, 771 F.3d at 200. We conclude that the record does not compel a contrary conclusion.

The thrust of Nolasco's evidence is that violence among and against gang members is systemic in El Salvador and shielded by police corruption. The agency weighed this evidence against DHS's evidence, including the State Department Report, which noted El Salvador's serious efforts to address corruption and prosecute police misconduct, and other submissions regarding the Salvadoran government's efforts to ensure the integrity of its police force, the establishment of violence prevention programs, the decline in overall violence, and efforts to combat gangs. *See Quitanilla v. Holder*, 758 F.3d 570, 574 n.6 (4th Cir. 2014) (noting that "[a] State Department report on country conditions is highly probative evidence" (quoting *Gonahasa v. INS*, 181 F.3d 538, 542 (4th Cir. 1999))). While Nolasco may disagree with how the agency weighed the documentary evidence, we do not

15

reweigh the evidence on a petition for review. *Mulyani*, 771 F.3d at 200. Moreover, "the mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured." *Singh v. Holder*, 699 F.3d 321, 334–335 (4th Cir. 2012) (internal quotation marks omitted). Viewing the record as a whole, we conclude that substantial evidence supports the BIA's decision.

*PETITION FOR REVIEW DENIED*