**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 22-2276**

———————

BEATRIZ ELIZABETH NUNEZ-GONZALEZ; M.A.T.G.,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

------------------------------

AMERICAN IMMIGRATION LAWYERS ASSOCIATION; ASYLUM SEEKER ADVOCACY PROJECT; ASYLUMWORKS; CAPITAL AREA IMMIGRANTS' RIGHTS COALITION; CENTER FOR GENDER & REFUGEE STUDIES; CHARLOTTE CENTER FOR LEGAL ADVOCACY; JUST NEIGHBORS; LEGAL AID JUSTICE CENTER; PISGAH LEGAL SERVICES; TAHIRIH JUSTICE CENTER; IMMIGRATION LAW CLINICS,

Amici Supporting Petitioner.

———————

On Petition for Review of an Order of the Board of Immigration Appeals.

———————

Argued: December 5, 2023                    Decided: August 12, 2024

———————

Before AGEE, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

———————

Denied by unpublished opinion. Judge Benjamin wrote the opinion, in which Judge Agee and Judge Quattlebaum joined.

———————

**ARGUED:** Alexandra Ribe, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners. Christina Petersen Greer, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Tomás Arango, HARVARD IMMIGRATION & REFUGEE CLINICAL PROGRAM, Cambridge, Massachusetts, for Amici Curiae. **ON BRIEF:** Benjamin J. Osorio, Danielle E. LeGrand, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners. Brian M. Boynton, Principal Deputy Assistant Attorney General, Sarah K. Pergolizzi, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. Katherine L. Evans, Charles Shane Ellison, Megan Gilligan, Immigrant Rights Clinic, DUKE UNIVERSITY SCHOOL OF LAW, Durham, North Carolina; Sabrineh Ardalan, Deborah Anker, Nancy Kelly, John Willshire Carrera, HARVARD IMMIGRATION & REFUGEE CLINICAL PROGRAM, Cambridge, Massachusetts, for Amici Curiae.

---

Unpublished opinions are not binding precedent in this circuit.

2

DEANDREA GIST BENJAMIN, Circuit Judge:

Beatriz Nunez-Gonzalez, a native of El Salvador who fled to the United States, applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). After hearing her testimony and considering the evidence, the Immigration Judge ("IJ") denied Nunez's claims, and the Board of Immigration Appeals ("BIA") affirmed. Nunez petitions the court for review of the BIA's order. Finding substantial evidence to support the BIA's decision, and discerning no reversible error, we deny the petition for review.

I.

A.

Nunez is a citizen of El Salvador, where she experienced a cycle of domestic violence.[1] It began with her father, who "drank a lot" and physically and sexually assaulted her mother. A.R. 231. Her parents eventually split, and when Nunez was twelve, her mother remarried Juan Arias. Not long after, Arias started "com[ing] home drunk," and the cycle of abuse continued. *Id.* at 232. He chased Nunez with a machete, accused her of covering up infidelity for her mother, threatened her, and physically and sexually assaulted her. As Nunez put it, Arias was "machista." *Id.* at 171 (internal quotation marks omitted). He was "domineering," that is, and he wanted to be "the man of the house." *Id.*

---

[1] We recite the facts based on Nunez's declaration and testimony before the IJ.

3

Nunez recounts calling the police on Arias three times.  First, she did so after he put a pill in her soda.  When the police arrived, however, "nothing happened" because her mother warned her not to say anything.  *Id.* at 174.  Second, a bystander called the police after Nunez ran away from home to avoid Arias, who was angry with her for purportedly having a boyfriend.  Nunez did not return home until the next day, so she does not know whether the police responded.  Third, Nunez called the police after Arias broke her sister's nose.  But when the officers arrived, her mother denied that anything happened.

At fourteen, Nunez met Pedro Tadeo, the future father of her son, M.A.T.G.  Hoping for an escape, she left with him, but the reprieve was short-lived.  Once Nunez became pregnant, Tadeo began hitting her "with a piece of leather" and threatening to harm the baby.  *Id.* at 233.  He even locked her in the house, where she remained until a passerby rescued her.  After that incident, Nunez did not call the police.  She suspected the police would return her to her mother's house, where she would suffer similar abuse.

Shortly after M.A.T.G. was born, Tadeo's violence escalated.  One night, he threatened Nunez and chased her with a machete.  She fled with M.A.T.G., and a woman took them in.  She did not call the police, as "they never really helped [her] when [she] needed them."  *Id.* at 181.  Another time, Tadeo pushed Nunez to the ground, "[want]ing to kick" her, but her sister intervened. *Id.* at 237.  Her sister "told him to leave or she would call the police," and he retreated. *Id.*

Nunez describes calling the police on Tadeo twice.  The first time was after he tried to assault her during a family celebration.  Officers "appeared about two hours later," but by then, he was gone.  *Id.* at 238.  She told them she did not want him to return, and her

4

brother offered to take them to Tadeo. But, apparently confused, they attempted to arrest her brother instead. Otherwise, they "did nothing." *Id.* The next time Nunez called the police on Tadeo, she had a similar experience. "The police did arrive," but not before Tadeo left. *Id.* at 186. When Nunez offered to take the officers to where he was, they responded, "No, that's not necessary. It would be a waste of time. Just don't allow him into the house again." *Id.* at 187 (internal quotation marks omitted).

Sometimes, Tadeo's abuse involved weapons. He once woke Nunez "with a blade" in the middle of the night. *Id.* at 238. He "wanted to eat," so she "got up to cook." *Id.* Dissatisfied with her cooking, he shouted that she "did not deserve to be a woman." *Id.* He then woke M.A.T.G. and held the blade to Nunez's head, threatening to kill them both if she called the police. The next day, she appeared to have filed a police report, *see id.* at 265, but it is unclear whether the police took any action. After that, Nunez and M.A.T.G. moved in with a cousin. That did not discourage Tadeo, though. He repeatedly and forcibly tried to remove Nunez from her cousin's house. One time, M.A.T.G. reported to his mother that Tadeo showed him a gun and said, "I got it for your mother, if [she] does not come back with me, this is for you guys." *Id.* at 240.

That was the breaking point. Nunez took her son and fled to the United States, where she now resides with him, her new partner, and a daughter. She knows from her sister that Tadeo still lives in El Salvador and asks about her; he has even tried to contact her on social media. She fears that if she returns, he will kill her.

5

B.

On December 17, 2016, the Department of Homeland Security ("DHS") initiated removal proceedings against Nunez and M.A.T.G.  DHS served Notices to Appear on them, alleging they were noncitizens who entered the United States without authorization. Nunez conceded their removability but timely applied for asylum, withholding of removal, and CAT protection, and she listed M.A.T.G. as a derivative beneficiary.

In her application, Nunez explained that she was persecuted in her home country by Arias and Tadeo, and that her persecution was based on her membership in two particular social groups: "Salvadoran women" and "partners of Pedro Tadeo."  In support, she submitted her declaration, declarations from family and friends, the police report she filed against Tadeo, a transcript of her testimony before the IJ, and country conditions reports. The reports describe the high rate of femicide in El Salvador, and the government's widespread failure to protect women from domestic violence.

On July 1, 2019, the IJ held a hearing to consider Nunez's claims, and Nunez testified through an interpreter.  Later that day, in an oral decision, the IJ denied Nunez relief.  As a threshold matter, the IJ found that Nunez's testimony was "not credible, let alone persuasive."  *Id.* at 95.  The IJ noted significant inconsistencies between her testimony and the declaration she submitted.[2]  Even if her claims were credible, the IJ held,

---

[2] For instance, the IJ found that Nunez did not mention calling the police after Arias put a pill in her soda in her declaration; she only referenced that call during her testimony. And Nunez omitted from her declaration that a bystander called the police on Arias when he was angry with her for allegedly having a boyfriend, which she described in her testimony.  Similarly, Nunez did not testify that Tadeo chased her with a machete, but she (Continued)

6

she did not meet the legal requirements for asylum, withholding of removal, or CAT protection. Nunez appealed to the BIA, which affirmed the IJ's decision and dismissed the appeal on December 1, 2022.

This petition followed. We have jurisdiction to review the BIA's final order under 8 U.S.C. § 1252(a)(1).

## II.

"Because the BIA affirmed the IJ's decision and supplemented it with its own opinion, we review both opinions." *Orellana v. Barr*, 925 F.3d 145, 151 (4th Cir. 2019). "We review legal conclusions de novo and factual findings for substantial evidence." *Id.* Under the "narrow and deferential" substantial evidence standard, we treat factual findings as conclusive unless a "reasonable adjudicator would have been compelled to a contrary view." *Djadjou v. Holder*, 662 F.3d 265, 273 (4th Cir. 2011); *Orellana*, 925 F.3d at 151 (citation omitted). Put differently, "even if the record plausibly could support two results, reversal is appropriate only where the evidence not only supports [the petitioner's] conclusion, but *compels* it." *Nolasco v. Garland*, 7 F.4th 180, 186 (4th Cir. 2021) (internal quotation marks omitted).

Finally, we uphold the BIA's determinations "unless they are manifestly contrary to the law and an abuse of discretion." *Orellana*, 925 F.3d at 151 (citation omitted). The

---

discussed that in her declaration. The IJ cited these examples, and several others, to conclude that "the inconsistencies and omissions are simply too great to rely on [Nunez's] testimony." A.R. 95.

BIA "abuse[s] its discretion if it fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Id.* (citations omitted).

## III.

## A.

We first consider Nunez's challenge to the denial of her application for asylum and withholding of removal under the Immigration and Nationality Act ("INA"). The INA empowers the Attorney General to grant asylum to any "refugee." 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, an applicant must demonstrate she is "unable or unwilling to return to her native country because of persecution or a well-founded fear of persecution on account of, as relevant here, [her] membership in a particular social group." *Orellana*, 925 F.3d at 151 (citing 8 U.S.C. § 1101(a)(42)(A)) (internal quotation marks omitted). If "an applicant claims that she fears persecution by a private actor, she must also show that the government in her native country is unable or unwilling to control her persecutor." *Id.* (citation omitted).

Moreover, the INA requires the Attorney General to withhold removal of an applicant who shows that her life or freedom would be threatened in her home country based on a similar statutorily protected ground. *Nolasco*, 7 F.4th at 186. Because withholding of removal is mandatory if an applicant makes the requisite showing, *id.* at 187, it has "a more stringent standard of proof." *Alvarez Lagos v. Barr*, 927 F.3d 236, 246 (4th Cir. 2019). Unlike an applicant for asylum, who must establish a "well-founded fear

8

of persecution," an applicant for withholding of removal must demonstrate a "clear probability of persecution." *Nolasco*, 7 F.4th at 187 (citation omitted). If an asylum application fails, then, an "application for withholding of removal will necessarily fail as well." *Id.* (citation omitted).

Nunez argues that the IJ and BIA erred in holding she is ineligible for asylum and withholding of removal. First, she proposes she is a member of the particular social group "Salvadoran women."[3] Second, she asserts there is a nexus between her persecution and her status as a Salvadoran woman. And third, she contends that the Salvadoran government is unable or unwilling to control her persecutors. Because we see no error in the conclusion below that the Salvadoran government is willing and able to protect Nunez, we refrain from deciding whether "Salvadoran women" is a particular social group, and whether there is a nexus between Nunez's membership in that group and the abuse she suffered.

"Whether a government is unable or unwilling to control a private actor is a factual question that must be resolved based on the record in each case." *Orellana*, 925 F.3d at 151 (internal quotation marks omitted). Here, the IJ found that every time Nunez called the police, the police responded. The IJ acknowledged that on many occasions, officers did not appear for "up to two hours," and that the country conditions reports demonstrate "inconsistency of [law] enforcement in the country at large." A.R. 101, 102. However, the IJ concluded that "as it applies to [Nunez], the police have apparently been responsive." *Id.* at 102. The IJ also found that circumstantial evidence, such as Tadeo's warnings to

---

[3] Nunez abandons her second proposed group, "partners of Pedro Tadeo," on appeal.

9

Nunez not to call the police, indicate the parties' own beliefs that the police would be responsive.

The BIA held that these factual findings were supported by the record. "[T]hat the police did not handle her call in the manner that she would have preferred," the BIA reasoned, "does not alone establish clear error in the [IJ's] factual findings." *Id.* at 5. And, like the IJ, the BIA recognized that the country conditions reports reflect "that the law enforcement response in El Salvador to women's requests for protection from domestic abuse is not consistent." *Id.* But, given the "totality of the record," the BIA did not think those reports established clear error in the IJ's findings. *Id.*

Nunez presents three reasons why, in her view, these determinations are wrong. We address each in turn.

1.

To begin, Nunez argues that the record compels the conclusion that the Salvadoran government is unable or unwilling to protect her. But there is substantial evidence underlying the contrary conclusion—that the government is, in fact, willing and able to assist Nunez—so we may not disturb that finding below.

In her declaration and testimony, Nunez describes calling the police on Arias, her stepfather, three times. Two of those times, the police responded to her call, but Nunez's mother either warned her not to say anything or turned the police away herself. The third time, Nunez does not know whether the police responded, because she ran away from home. Likewise, Nunez recounts calling the police on Tadeo twice, and both times, the police responded.

10

The police response was flawed, particularly with respect to Tadeo. Officers reported to Nunez's location only after he left—once, two hours late—and they showed no interest in finding him. In Nunez's view, their response was merely "empty or token 'assistance.'" Pet. Br. at 24–25 (citing *Orellana*, 925 F.3d at 153)). In *Orellana v. Barr*, the court held that evidence of such assistance "cannot serve as the basis of a finding that a foreign government is willing and able to protect an asylum seeker." *Orellana*, 925 F.3d at 153. But there, the applicant testified that "the police often did not respond [to her calls] at all," *id.* at 152, and neither the IJ nor the BIA considered her "many unsuccessful calls to the police." *Id.* at 150. Here, the IJ and BIA considered Nunez's every call, and they concluded that the police responded—albeit imperfectly—every time.

There is also ample evidence establishing the parties' own beliefs that the police, if contacted, would take action. Nunez's mother cautioned her not to tell the police about Arias' abuse; her mother denied his abuse to the police; Nunez feared that the police would return her to her mother's house; Nunez's sister threatened Tadeo with calling the police, which caused him to retreat; and Tadeo threatened to kill Nunez and M.A.T.G. if they called the police. This indicates that both the persecutors and the victims in this case "believed the government was indeed willing and able to crack down on [domestic] violence." *Mulyani v. Holder*, 771 F.3d 190, 199 (4th Cir. 2014).

For these reasons, we reject Nunez's first claim of error.

2.

Next, Nunez contends that the IJ and BIA failed to properly weigh the country conditions reports. In support, she cites *Hernandez-Avalos v. Lynch*, where the court found

11

"several errors in the BIA's conclusion" that the Salvadoran government was willing and able to protect an asylum seeker. 784 F.3d 944, 951 (4th Cir. 2015). There, however, the BIA entirely "failed to consider relevant evidence of country conditions in El Salvador." *Id.* Here, both the IJ and BIA considered that evidence, and they noted issues with the Salvadoran government's response to domestic violence. But in their view, that did not outweigh the record as a whole, which demonstrated a consistent police response to Nunez in particular. We therefore reject this claim of error, too.

3.

Last, Nunez faults the IJ and BIA for not considering her youth in their analysis of her decisions to seek, or not to seek, police protection. Indeed, we have directed the BIA to take a "child-sensitive" approach in evaluating whether an asylum seeker was justified in declining to contact the police. *Portillo Flores v. Garland*, 3 F.4th 615, 636 (4th Cir. 2021). However, neither the IJ nor the BIA blamed Nunez for not calling the police. Instead, they focused on what happened *after* she called: the police responded. Thus, we reject Nunez's third and final claim of error.

Viewing the record as a whole, we find that substantial evidence supports the determination that the Salvadoran government is willing and able to protect Nunez, and we discern no abuse of discretion.

B.

We now turn to Nunez's challenge to the denial of her application for CAT relief. To qualify for such relief, an applicant must make two showings. First, she must establish that "it is more likely than not that if removed she will suffer future mistreatment"

12

amounting to torture, and second, she must demonstrate that "this likely future mistreatment will occur . . . with the consent or acquiescence of government." *Alvarez Lagos*, 927 F.3d at 246 (internal quotation marks omitted); *see* 8 C.F.R. § 1208.16(c)(2). Acquiescence requires that a "public official, prior to the activity constituting torture, have awareness of such activity," either through "actual knowledge or willful blindness," and "thereafter breach his or her legal responsibility to intervene to prevent such activity." 8 C.F.R. § 1208.18(a)(7); *see Mulyani*, 771 F.3d at 200.

The IJ concluded, and the BIA affirmed, that Nunez did not make either showing, and so was not eligible for CAT protection. Regarding the first prong, Nunez argues that the IJ failed to review "all evidence relevant to the possibility of future torture," as an IJ is required to do. 8 C.F.R. § 1208.16(c)(3). With respect to the second prong, she contends that the Salvadoran government knowingly failed to intervene in the past, so it is likely to do so again.

For the reasons articulated above, *see supra* Part III.A, we hold that substantial evidence supports the conclusion that the Salvadoran government would not acquiesce to Nunez's harm. Because Nunez cannot satisfy this second prong, we decline to reach the first prong.

## IV.

We recognize that Nunez has suffered domestic violence in El Salvador, and we do not deny the difficulty of those circumstances. Yet we are constrained. Our charge "is not to reweigh the evidence," but "to ensure that substantial evidence supports the BIA's

13

judgment." *Mulyani*, 771 F.3d at 200 (internal citation omitted). And here, it does.

Accordingly, we must deny the petition for review.

*PETITION DENIED*