**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-1513

RUTH JEANETTE ORELLANA, a/k/a Ruth Yeanette-Orellana, a/k/a Ruth Jeanetta Orellana,

Petitioner,

v.

WILLIAM P. BARR, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: January 29, 2019                                    Decided: May 23, 2019

Before MOTZ, KING, and WYNN, Circuit Judges.

Petition for review granted; remanded for further proceedings by published opinion. Judge Motz wrote the opinion, in which Judge King and Judge Wynn joined.

**ARGUED:** Michael Ernest Rosado, LAW OFFICES OF ROSADO & SOLTREN, P.C., Beltsville, Maryland, for Petitioner. Rebecca Hoffberg Phillips, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Chad A. Readler, Acting Assistant Attorney General, John S. Hogan, Assistant Director, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

DIANA GRIBBON MOTZ, Circuit Judge:

Ruth Jeanette Orellana, a native and citizen of El Salvador, petitions for review of the final order of the Board of Immigration Appeals ("BIA") denying her all relief from deportation. The BIA upheld the finding of an immigration judge ("IJ") that Orellana, although persecuted because of her membership in a particular social group, had failed to establish that the Salvadoran government was unwilling or unable to protect her from this persecution. Because the agency disregarded and distorted significant portions of the record in reaching this conclusion, we grant Orellana's petition and remand the case for further proceedings.

I.

A.

In 1992, when Orellana was fifteen years old, she met Jose Teodoro Garcia. They started dating, and soon began living together in San Vicente, El Salvador. When Orellana became pregnant with their first child the next year, Garcia began abusing her both verbally and physically. A pattern emerged in which Garcia would spend his wages on alcohol and then, while intoxicated, violently beat Orellana. He would "throw [her], shove [her]," "hit [her] with his fist," and "choke [her]." Garcia also threatened her life with a grenade and by putting his gun to her head.

In 1999, Orellana reported Garcia's abuse to the Salvadoran police for the first time. The police officers responded to her call by talking to Garcia, but not arresting

him. Instead, they told Orellana that Garcia was "going to be alright and won't be bothering you."

From that time forward, Orellana "would try to call the police every time [Garcia] would become abusive." She would wait for the police in a locked room with their two children and a sanitation bucket, while Garcia would pace outside with a machete. The police would not "show up to [her] house for hours," or sometimes not "show up" at all.

Orellana also made efforts to become independent of Garcia, which he violently resisted. She tried to leave him by walking three hours to her grandmother's house, but he followed her and then assaulted her. She found employment performing childcare in a neighboring town, but Garcia showed up at her work and accused her of infidelity until she was fired. When she used disaster relief aid to build a cinderblock shelter apart from the house to protect herself and her children, Garcia broke its windows in an attempt "to get inside to hurt" her.

In 2006, Orellana petitioned the San Vicente family court for an order requiring Garcia to "stay in the [main] house" and away from her cinderblock shelter. The family court granted a temporary protective order and summoned Garcia to a hearing scheduled for July 3, 2006. Orellana appeared on July 3 and told the family court that Garcia had "threatened her and demanded that she withdraw the complaint." Garcia, however, ignored the family court's summons. The family court granted no relief but instead continued the case for a second hearing at which neither party appeared. The family court then closed the case.

3

Garcia's abuse of Orellana persisted. In 2009, after Garcia again threatened Orellana with a machete, the police "finally showed up" in response to her call for help. Operating under the mistaken assumption that there existed a warrant for Garcia's arrest, the police seized him and confiscated the machete. Garcia then spent six days in jail before appearing in front of the San Vicente magistrate's court. At this hearing, Orellana agreed to mediation with Garcia, but asked for a protective "order so [Garcia] could not approach [the cinderblock] house."+

The magistrate's court did not issue a protective order. Instead, the magistrate advised Garcia to stop entering "the home when he [was] drunk" and "abstain from threatening" Orellana. Garcia asked for the return of his machete, and, with the consent of the government's prosecutor, the magistrate granted this request. But Garcia did not follow the magistrate's instructions. The next time he was drunk and abusive, Orellana again called the police. But when she asked the police officers to take Garcia into custody, they told her they could not because no formal protective order was in place.

Orellana then made a third attempt to get a protective order, traveling an hour by bus to the family court. But when Orellana arrived, the family court employees would not "take care of [her]." Instead, they told her to "come back another day because they were too busy." The family court employees also told Orellana to go to the police station and "talk to the person in charge there." Orellana did so but without success; the station chief too would not talk to her. When Garcia continued to attack her, Orellana would call the police, who told her to "lock [her]self in" and "stay inside."

In December of 2010, Garcia announced that he planned to kill Orellana, showing his mother the knife that he intended to use. Orellana learned of the plan and fled El Salvador a month later, leaving her teenage children with other family.

B.

When Orellana arrived in the United States on March 10, 2011, the Department of Homeland Security ("DHS") detained her. After concluding that Orellana stated a credible fear of persecution, DHS charged her as removable pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I). Orellana conceded removability and applied for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").

The Government stipulated to the facts set forth above. It further agreed that Garcia's abuse of Orellana was serious enough to constitute persecution and that this persecution was directed at her because of her membership in a particular social group, namely "Salvadoran women in domestic partnerships who are viewed as property."[1] Accordingly, the extensive proceedings that followed focused solely on the Salvadoran government's response to Orellana's stipulated persecution.

At a hearing on April 25, 2013, Orellana testified at length in support of her application. In addition, she provided Salvadoran court records from 2006 and 2009 substantiating her testimony.

---

[1] The Government indicates that, if the case is remanded, it will seek to withdraw its stipulation as to Orellana's social group. We express no opinion as to the Government's ability to do so or to the merits of Orellana's social group claim; as the parties agree, neither issue is properly before us.

Orellana also submitted the affidavits of two country conditions experts, as well as multiple U.S. State Department country reports issued between 2009 and 2012. Her experts explained that Salvadoran laws failed to protect women because "[p]olice, judges, prosecutors and other officials often believe that women deserve the blame for the violence they encounter at home, and that domestic violence cases are a waste of time." They further noted that "there are many barriers to obtaining . . . orders of protection, and even when they are issued, they are often inadequately drafted and lack any enforcement whatsoever." The State Department reports offered similar conclusions, finding that violence against women in El Salvador "was a widespread and serious problem" and that laws combatting it "were not well enforced."

The IJ expressly found Orellana to be credible. Nevertheless, on June 3, 2013, the IJ denied Orellana's claims, concluding that the Salvadoran government was willing and able to protect her. The IJ described Orellana's case as one of "shocking domestic violence," but found that she had not carried her burden as to the Salvadoran government's response because she did not "go[] through the entire process" in her effort to obtain protection.

Orellana appealed the IJ's decision. Rather than reach the merits, the BIA remanded the case in light of intervening Board precedent to allow "the parties . . . the opportunity to update the record, and to make any additional legal and factual arguments regarding particular social group and nexus, as well as the [Salvadoran] government's ability and willingness to protect the respondent." On remand, the Government again did not challenge the facts of the abuse that Orellana suffered, or that it resulted from her

6

membership in a particular social group. But the Government continued to argue that the Salvadoran government could and would adequately protect her.

On November 20, 2015, the IJ issued a new order denying all relief to Orellana. The IJ acknowledged that the State Department's reports described domestic violence as a major human rights problem in El Salvador. The IJ nonetheless found that the Salvadoran government "was able and tried to protect [Orellana]." In reaching this conclusion, the IJ relied on the following facts: that the Salvadoran government (1) in 2006 allowed Orellana to petition for a protective order, (2) in 2009 detained Garcia for six days, and (3) later in 2009 "offered continued assistance" to Orellana when officials responded to her third attempt to obtain a protective order by telling her "to come back another day" when they were not "too busy." The IJ did not mention Orellana's many unsuccessful calls to the police or the affidavits from Orellana's country conditions experts.

On March 17, 2017, the BIA upheld the IJ opinion, similarly omitting mention of the unanswered police calls and country conditions affidavits, and stating that clear error review "precludes reversal even if the reviewing authority views the evidence differently." When Orellana petitioned this court for review, the Government filed an unopposed motion, which we granted, to remand and allow the BIA to reconsider Orellana's claims and review both her personal and expert testimony.

On April 5, 2018, the BIA reaffirmed the IJ's decision and adopted its factual determinations. The BIA this time gave direct attention to the expert affidavits that the agency had previously overlooked, but ultimately concluded that substantial evidence

7

still supported the IJ's finding as to government protection on the particularized facts presented.

Orellana again petitions this court for review. Because the BIA affirmed the IJ's decision and supplemented it with its own opinion, we review both opinions. *See Ai Hua Chen v. Holder*, 742 F.3d 171, 177 (4th Cir. 2014).[2] We review legal conclusions de novo and factual findings for substantial evidence. *See Zavaleta-Policiano v. Sessions*, 873 F.3d 241, 246 (4th Cir. 2017).

II.

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum and withholding of removal to eligible applicants. 8 U.S.C. § 1158(a)(1). To qualify, an applicant must demonstrate that she is "unable or unwilling to return to" her native country "because of persecution or a well-founded fear of persecution on account of," as relevant here, "[her] membership in a particular social group." *Id.* § 1101(a)(42)(A). When an applicant claims that she fears persecution by a private actor, she must also show that the government in her native country "is unable or unwilling to control" her persecutor. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015). Whether a government is "unable or unwilling to control" a private actor "is a factual question that must be resolved based on the record in each case." *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011) (internal quotation marks omitted).

_____

[2] Here, the relevant opinions are the IJ's November 20, 2015 order and the BIA's April 5, 2018 order.

In reviewing such decisions, we treat factual findings "as conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view," and we uphold the agency's determinations "unless they are manifestly contrary to the law and an abuse of discretion." *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011). These standards demand deference, but they do not render our review toothless. The agency "abuse[s] its discretion if it fail[s] to offer a reasoned explanation for its decision, or if it distort[s] or disregard[s] important aspects of the applicant's claim." *Id.*; *accord Zavaleta-Policiano*, 873 F.3d at 247.

Orellana contends that the IJ and the BIA did precisely this in their reasoning as to whether the Salvadoran government was willing and able to protect her.[3] We must agree. Examination of the record demonstrates that the agency adjudicators erred in their treatment of the evidence presented. Here, as in *Tassi* and *Zavaleta-Policiano*, the agency adjudicators both disregarded and distorted important aspects of the applicant's claim.

First, agency adjudicators repeatedly failed to offer "specific, cogent reason[s]" for disregarding the concededly credible, significant, and unrebutted evidence that Orellana provided. *Tassi*, 660 F.3d at 722; *accord Ai Hua Chen*, 742 F.3d at 179. For example,

---

[3] Orellana also contends that the BIA failed to conduct separate inquiries into the Salvadoran government's "willingness" to protect her and its "ability" to do so. *See Madrigal v. Holder*, 716 F.3d 499, 506 (9th Cir. 2013) (finding legal error where the BIA considered a government's efforts at offering protection without "examin[ing] the efficacy of those efforts"). After careful review of the record, we must reject this contention. The BIA applied the proper legal framework. It treated "willingness" and "ability" as distinct legal concepts, and it sufficiently addressed each in its order.

9

Orellana testified that during her third attempt to obtain a protective order in 2009, the Salvadoran family court refused to offer aid and instead directed her to the police station, which also turned her away. Yet the IJ gave this evidence *no* weight.

The IJ declined to do so on the theory that it was "unclear and confusing as to why exactly she was not able to get assistance from either the police or the court during these times." But the record offers no evidence to support the view that the Salvadoran government officials had good reason for denying Orellana all assistance. *Cf. Tassi*, 660 F.3d at 720 (requiring agency to "offer a specific, cogent reason for rejecting evidence" as not credible). Rather, Orellana offered the *only* evidence of their possible motive aside from the family court officials' claim that they were "too busy" — namely, uncontroverted expert evidence that "[d]iscriminatory gender biases are prevalent among [Salvadoran] government authorities responsible for providing legal protection to women."

Nor did the IJ or the BIA address Orellana's testimony, which the IJ expressly found credible, that she called the police "many times" during a twelve-year period, calls to which the police often did not respond at all. This testimony, too, was uncontroverted. To "arbitrarily ignore[]" this "unrebutted, legally significant evidence" and focus only on the isolated instances where police did respond constitutes an abuse of discretion. *Zavaleta-Policiano*, 873 F.3d at 248 (quoting *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009)); *accord Hernandez-Avalos*, 784 F.3d at 951 ("[A]n IJ is not entitled to ignore an asylum applicant's testimony in making . . . factual findings.").

The agency's analysis also "distorted" the record evidence concerning the instances of government involvement. *Tassi*, 660 F.3d at 719. For example, although the IJ accepted as credible Orellana's testimony that Salvadoran family court employees rebuffed her third request for a protective order because "they were too busy" and suggested that she try again another day, the IJ inexplicably concluded from this testimony that Salvadoran family court employees "offered continued assistance" to Orellana. The IJ similarly distorted the record in finding that, in 2006, "the [family] court in El Salvador acted on [Orellana's] behalf" when it took no action against Garcia, and in finding that, in 2009, a different Salvadoran court "attempted to assist" Orellana by *denying* her the protective order that she requested.

Despite these errors, the Government asserts three reasons why the BIA's order assertedly finds substantial evidentiary support in the record. None are persuasive.

First, the Government argues that Orellana's own testimony established that she had "access to legal remedies" in El Salvador. But access to a nominal or ineffectual remedy does not constitute "meaningful recourse," for the foreign government must be both willing *and able* to offer an applicant protection. *Rahimzadeh v. Holder*, 613 F.3d 916, 921 (9th Cir. 2010). As the Second Circuit has explained, when an applicant offers unrebutted evidence that "despite repeated reports of violence to the police, no significant action was taken on [her] behalf," she has provided "ample ground" to conclude "that the BIA was not supported by substantial evidence in its finding that [she] did not show that the government was unwilling to protect [her] from private persecution." *Aliyev v. Mukasey*, 549 F.3d 111, 119 (2d Cir. 2008). Evidence of empty or token "assistance"

11

cannot serve as the basis of a finding that a foreign government is willing and able to protect an asylum seeker.

Second, the Government contends that Orellana cannot show that the Salvadoran government is unable or unwilling to protect her because she did not report her abuse until 1999 and later abandoned the legal process. But Orellana's initial endurance of Garcia's abuse surely does not prove the availability of government protection during the decade-long period that followed, during which time she did seek the assistance of the Salvadoran government without success. As to Orellana's asserted abandonment of the Salvadoran legal process, we agree with the Government that an applicant who relinquishes a protective process without good reason will generally be unable to prove her government's unwillingness or inability to protect her. But there is no requirement that an applicant persist in seeking government assistance when doing so (1) "would have been futile" or (2) "have subjected [her] to further abuse." *Ornelas-Chavez v. Gonzales*, 458 F.3d 1052, 1058 (9th Cir. 2006). Here, Orellana offered undisputed evidence of both.

Finally, the Government suggests that even if the Salvadoran government had previously been unwilling or unable to help Orellana, country conditions had changed by 2009 such that she could receive meaningful protection. Because the agency never asserted this as a justification for its order, principles of administrative law bar us from

12

dismissing the petition on this basis. *See SEC v. Chenery Corp.*, 318 U.S. 80, 94–95 (1943).[4]

We have often explained that an applicant for asylum is "entitled to know" that agency adjudicators "reviewed all [her] evidence, understood it, and had a cogent, articulable basis for its determination that [her] evidence was insufficient." *Rodriguez-Arias v. Whitaker*, 915 F.3d 968, 975 (4th Cir. 2019); *accord, e.g.*, *Baharon*, 588 F.3d at 233 ("Those who flee persecution and seek refuge under our laws have the right to know that the evidence they present . . . will be fairly considered and weighed by those who decide their fate."). That did not happen here.

We therefore vacate the order denying Orellana asylum.[5] On remand, the agency must consider the relevant, credible record evidence and articulate the basis for its decision to grant or deny relief.

---

[4] Moreover, Orellana testified that from 2009 until she fled the country, the Salvadoran courts and police denied her requests for protection on multiple occasions. Her experience accords with the country conditions evidence in the record, including the State Department's 2012 report, which explained that the Salvadoran government's "efforts to combat domestic violence" remained "minimally effective."

[5] We must also vacate the agency's determinations as to withholding of removal and CAT protection because the agency derived them from this erroneous finding, leaving us no other basis on which to affirm. *See Zavaleta-Policiano*, 873 F.3d at 250.

13

## III.

For the foregoing reasons, we grant Orellana's petition for review and remand the case to the BIA for proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED;*
*REMANDED FOR FURTHER PROCEEDINGS*