**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 21-2273**

───────────

LUCINDA AURORA LARIOS-VARGAS, K.A.V.L,

Petitioners,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

───────────

On Petition for Review of an Order of the Board of Immigration Appeals.

───────────

Argued:  January 24, 2023                    Decided:  May 11, 2023

───────────

Before NIEMEYER and QUATTLEBAUM, Circuit Judges, and FLOYD, Senior Circuit Judge.

───────────

Petitions denied by unpublished opinion.  Senior Judge Floyd wrote the opinion in which Judge Niemeyer and Judge Quattlebaum joined.

───────────

**ARGUED:**  Alaina Marie Taylor, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners.  Anthony Jason Nardi, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:**  Benjamin J. Osorio, MURRAY OSORIO PLLC, Fairfax, Virginia, for Petitioners.  Brian Boynton, Principal Deputy Assistant Attorney General, Leslie McKay, Senior Litigation Counsel, Rachel L. Browning, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

───────────

Unpublished opinions are not binding precedent in this circuit.

FLOYD, Senior Circuit Judge:

Petitioners Lucinda Larios-Vargas (Larios) and her daughter, K.A.V.L. (collectively, "Petitioners"), are citizens of Honduras. Petitioners petition this Court for review of a final order of removal by the Board of Immigration Appeals (BIA) affirming an immigration judge's (IJ) order denying their applications for asylum, withholding of removal, and protection under the Convention Against Torture (CAT), and ordering their removal from the United States to Honduras. For the reasons that follow, we deny their petitions for review.

I.

Petitioners are natives and citizens of Honduras who arrived in the United States at or near Hidalgo, Texas, on or about November 8, 2016, without being admitted or paroled by an immigration officer. On November 9, 2016, the Department of Homeland Security ("DHS") served Petitioners with Notices to Appear, charging them with removability pursuant to 8 U.S.C. § 1182(a)(6)(A)(i), as aliens present in the United States without having been admitted or paroled, or who had arrived in the United States at any time or place other than as designated by the Attorney General. Petitioners appeared before the IJ on September 25, 2017, where, through counsel, they conceded the charge of removability.

As relief from removal, Petitioners sought asylum, withholding of removal, and protection under the CAT. Larios testified that she came to the United States because she was a single mother and was twice threatened by a member of the MS-13 gang. Gang members regularly came to her family's house for meals and parties, in which Larios

2

refused to participate. In August 2016, while Larios was at her family's home, a gang member "ran into [her]," "tried to hit [her]," and threatened to kill her. A.R. 137–38. Larios locked herself in her house and called the police twice, but they did not answer. She then ran to a neighbor's house, and the neighbor called the police for her. Again, the police did not answer. When she called the police a fourth time, they told her that "they were not police from [her] area." A.R. 138.

A week later, the same gang member confronted Larios again and "said that [she] was going to pay for" calling the police because he thought "[she] was indifferent towards them" and "thought too highly of [her]self," and because she was a single mother. A.R. 138–40, 149. On cross-examination, Larios described how MS-13 members threaten anyone who opposes the gang or calls the police on them, regardless of their gender. Larios was not sure how the gang member discovered that she had called the police, but it was possible that her family informed him. Larios did not attempt to call the police again because she did not believe that they would protect her.

Larios claimed eligibility for asylum and withholding of removal based on her "anti-gang" political opinion, her nationality, and her membership in six proposed social groups—"single mothers," "single mothers in Honduras," "members of the Larios family," "members of the Larios family who oppose the gangs," "women who oppose gangs in Honduras," and "women who filed police reports against gangs in Honduras." A.R. 131–32. K.A.V.L. claimed eligibility for asylum based on membership in the proposed social groups of individuals with "[n]uclear family ties to Lucinda Larios-Vargas," "children of

3

single mothers," and members of "the Larios family." A.R. 133.[1]

On October 3, 2016, the IJ found Petitioners removable as charged and denied their applications. Regarding their applications for asylum and withholding of removal, it explained that substantial evidence did not support the conclusion that they experienced past persecution, and that even if they had, the proposed social groups of which they claimed to be members were not cognizable, save for the family-based groups. However, it further found that Petitioners did not demonstrate a nexus between these family-based groups and their past or potential future persecution. Additionally, the IJ recognized that "[t]he documentary evidence in the record shows that the Government of Honduras has difficulty in prosecuting or controlling the gangs." A.R. 81. Nonetheless, it ultimately concluded that "[a]lthough [Larios] attempted to inform the police in Honduras that the MS-13 member had threatened her, she has not shown that the government would be unable or unwilling to control this specific single actor." A.R. 82. It continued:

> [I]n this incidence the Court recognizes that this person is a member of a gang and could potentially have resources for which he would be able to locate her or follow her in the future should she return to Honduras. However, on a whole, the Court finds that based on [Larios's] inability . . . to ultimately contact the authorities and seek their assistance with this one individual . . . she has not met her burden to show the government is unable or unwilling to control this particular person.

A.R. 82. Because it denied Petitioners' asylum applications, the IJ also denied Petitioners' applications for withholding of removal, explaining that this form of relief is subject to a lower burden of proof than asylum.

---

[1] K.A.V.L. applied for relief as both a derivative applicant on her mother's application as well as a principal applicant on her own asylum application. A.R. 3.

Finally, the IJ denied Petitioners' applications for CAT protection because they did not show that the government would consent to or acquiesce in their torture. It reasoned that "[Petitioners'] claim that they would face torture in Honduras is too speculative to merit protection," and that they "have not established past mistreatment that would constitute torture. Nor have they established that any possible future mistreatment would be with the consent or acquiescence of a government official, including a willful blindness." A.R. 84.

Petitioners appealed the IJ's order to the BIA, which affirmed. Larios argued that contacting the police regarding MS-13's threats would have been futile, thereby excusing her failure to report the threats. The BIA disagreed, explaining that the IJ had not clearly erred by "finding that [Larios] had not established that the government of Honduras was unwilling or unable to control the man who threatened her." A.R. 4. It continued that Larios testified that the gang member who threatened her may have learned of her attempts to contact the police "from someone other than the police." A.R. 4. Consequently, it "[could not] say that reporting the threats would have been futile." A.R. 4. Further, it found no clear error in the IJ's conclusion that the Honduran government, despite having "severe issues controlling crime and gangs," was unwilling or unable to control the individual who threatened Larios. A.R. 4.

Finally, the BIA affirmed the IJ's denial of CAT protection, holding that the IJ "did not clearly err in finding that [Petitioners] had not shown that it was more likely than not that they would be tortured by or with the consent or acquiescence of a public official." A.R. 5. The BIA explained that the general country conditions evidence that Petitioners

5

submitted did not demonstrate that Petitioners themselves would suffer torture.

Petitioners then timely petitioned this Court for review of the BIA and IJ's final order of removal.

## II.

When the BIA has adopted and supplemented an immigration judge's decision, we review both decisions. *Hernandez-Cartagena v. Barr*, 977 F.3d 316, 319 (4th Cir. 2020) (citation omitted). We review factual findings for substantial evidence, treating them as conclusive "unless a reasonable adjudicator would have been compelled to reach a contrary conclusion." *Cruz v. Sessions*, 853 F.3d 122, 128 (4th Cir. 2017) (citation omitted). Legal determinations are reviewed de novo. *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 948 (4th Cir. 2015) (citation omitted).

We also review the BIA's decision for abuse of discretion, which occurs when the BIA "fails to offer a reasoned explanation for its decision, or if it distorts or disregards important aspects of the applicant's claim." *Portillo Flores v. Garland*, 3 F.4th 615, 626 (4th Cir. 2021) (quotation omitted). "An applicant for asylum is entitled to know that agency adjudicators reviewed all [her] evidence, understood it, and had a cogent, articulable basis for its determination that [her] evidence was insufficient." *Id.* (simplified). "As a general matter, when the Board errs, 'the proper course . . . is to remand to the agency for additional investigation or explanation.'" *Alvarez Lagos v. Barr*, 927 F.3d 236, 249 (4th Cir. 2019) (quoting *INS v. Ventura*, 537 U.S. 12, 16 (2002) (per curiam)).

Finally, single-member decisions of the BIA—such as the one subject to review

6

here—are not entitled to *Chevron* deference. *Martinez v. Holder*, 740 F.3d 902, 909–10 (4th Cir.), *as revised* (Jan. 27, 2014).

### III.

First, Petitioners challenge the agency's denial of their claims for asylum. If an applicant for asylum fears persecution by a non-governmental actor, she must establish:

> (1) that she has suffered past persecution or has a well-founded fear of future persecution; (2) that the persecution is "on account of" her race, religion, nationality, membership in a particular social group, or political opinion; and (3) that the persecution is perpetrated by an organization that her home country's government is unable or unwilling to control.

*Portillo Flores*, 3 F.4th at 626 (simplified); *see also* 8 U.S.C. § 1101(a)(42)(A). As relevant here, "[a]n applicant who relinquishes a protective process without good reason will generally be unable to prove her government's unwillingness or inability to protect her." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (citation omitted). Importantly, however, this Court has rejected a per se reporting requirement, explaining that an applicant can be excused from seeking government intervention if doing so "(1) would have been futile or (2) [would] have subjected her to further abuse." *Id.* (simplified).

Here, Petitioners do not challenge the agency's determination that they did not satisfy the first two factors to qualify for a grant of asylum or withholding of removal—(1) past persecution or a well-founded fear thereof (2) on account of a protected ground. The government does not address these factors, either. Instead, the parties only focus on the third factor—whether the BIA and IJ erred in finding that the Honduran government was not able or willing to control the MS-13 gang member who threatened Larios.

7

Because the parties center their arguments on the third factor in the test for asylum—that Petitioners face persecution by "an organization that [their] home country's government is unable or unwilling to control"—we begin there. *Portillo Flores*, 3 F.4th at 626 (quotation omitted). Petitioners contend that the agency overlooked Larios's testimony regarding her multiple, unsuccessful attempts to contact the police, that the BIA failed to consider whether making a police report would subject her to further harm, and that the IJ improperly applied a per se reporting requirement. The government responds that substantial evidence does not compel a reversal of the agency's decision.

As discussed above, after her first encounter with the MS-13 gang member who threatened her, Larios called the police four times in quick succession then did not seek any further government assistance. One week after her first encounter with the gang member and her attempts to contact the police, the gang member returned to her home "and said that [she] was going to pay" for calling the police. A.R. 138. When asked whether she ever had problems with the Honduran police before these incidents, Larios responded in the negative. A.R. 145. Further, she "[did not] know how [the gang member] found out [that she] had called the police." A.R. 139. She testified that MS-13 members "share a lot of information" with each other, and she speculated that "[p]erhaps" someone in her family informed the gang of her phone calls. A.R. 141, 150. In addition to this testimony, Larios submitted a country conditions report, which describes how "[c]orruption and impunity remain[] serious problems within [Honduran] security forces," but that the government has taken steps to ameliorate this issue. A.R. 215. The report also notes that the Honduran government struggles to control gangs. *See* A.R. 255.

8

In light of this evidence, the IJ found that "based on [Larios's] inability . . . to ultimately contact the authorities and seek their assistance with this one individual, [] she has not met her burden to show [that] the government is unable or unwilling to control this particular person." A.R. 82. For its part, the BIA acknowledged that Larios's "failure to report the harm [that] she suffered to the police forecloses relief absent a showing that reporting the incident would have been futile or subjected her to greater harm." A.R. 4. However, it then reasoned that it could not "say that reporting the threats would have been futile in light of [Larios's] testimony regarding the possibility that the gang member learned of her phone calls to the police from someone other than the police." A.R. 4.

Here, the agency reasonably concluded that the evidence was insufficient to show that the police were unable or unwilling to protect Larios and her daughter. First, the agency did not abuse its discretion. Contrary to Petitioners' assertions, the BIA and IJ explicitly recognized Larios's repeated calls to the police and the police's lack of response. Further, although a closer question, the IJ's statements concerning Larios's inability to contact the authorities do not amount to the application of a per se reporting requirement. Rather, these statements merely serve to emphasize the thin record regarding Larios's concerns about contacting the police, which included only her testimony and a country conditions report. The IJ simply appears to have concluded that Larios abandoned the Honduran legal system too quickly and without good reason. Additionally, the BIA did not commit legal error by not explicitly considering whether reporting the gang member to the authorities would have resulted in further harm to Petitioners. In their appeal to the BIA, Petitioners made the bare assertion that "[r]eporting MS-13 to police . . . would have

9

led to reprisals" and otherwise concentrated on their arguments on futility. A.R. 18. We will not fault the BIA for discussing this issue in a cursory manner when Petitioners left this argument unsubstantiated, despite bearing the burden of proof on this issue.

Second, substantial evidence does not compel a conclusion opposite to the one that the agency reached. Larios appears to have abandoned the Honduran legal process "without good reason." *Orellana*, 925 F.3d 153 (citation omitted). Despite not experiencing any prior problems with the Honduran police, she swiftly gave up on seeking their assistance. We recognize that the gang's threats to Larios and the police's lack of response to her phone calls must have been frightening and frustrating. Nevertheless, this Court typically requires far more from petitioners seeking to show that reporting threats and violence to the authorities would have been pointless or dangerous. *See, e.g.*, *Portillo Flores*, 3 F.4th at 635–36 (concluding that the agency abused its discretion when it denied asylum to an El Salvadoran teenager when he offered extensive evidence that the police and a gang were colluding); *Perez-Morales v. Barr*, 781 F. App'x 192, 199 (4th Cir. 2019) (holding that the BIA abused its discretion by overlooking evidence that petitioner did not report gang threats to the police "because he believed they had been bought off by the gang" and "a friend was killed after reporting gang members to police").

Further, Larios challenges the BIA's reasoning that it "[could not] say that reporting the threats would have been futile" given her "testimony regarding the possibility that the gang member learned of her phone calls to the police from someone other than the police." A.R. 4. She deems this assertion irrelevant to the futility analysis, as there is no requirement that a persecutor learn of a police report directly from the authorities

10

themselves. Indeed, we have never imposed such a requirement and have, in fact, recognized that gangs gather information about their victims from various sources within the community. *See Portillo Flores*, 3 F.4th at 635 (recognizing petitioner's evidence that gangs use "sources within the police, government and community" to collect information about those who make police reports). But Larios's argument overlooks the crux of the futility analysis—whether the police would meaningfully respond to a report of persecution. *See Orellana*, 925 F.3d at 153 (considering whether the Salvadoran government would provide petitioner with "meaningful protection"). If Larios's family tipped off the gang member about her calls to the police, that may demonstrate that Larios's family members betrayed her confidence—not that the police would fail to assist Larios if she made a report. Ultimately, even if this Court would have come to a different conclusion had it reviewed the evidence in the first instance, it cannot reverse the agency's conclusion unless substantial evidence compels it, which is not the case here. Thus, we deny the petitions for review of the BIA and IJ's denial of Petitioners' applications for asylum and withholding of removal.[2, 3]

---

[2] Moreover, even assuming the agency erred in finding that the Honduran government was unwilling or unable to control the gang member who threatened Larios, Petitioners never challenged the agency's finding that they did not establish that they faced past persecution or had a well-founded fear of future persecution on account of a protected ground. Thus, they waived these issues and remain ineligible for asylum. *Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to 'develop [its] argument'—even if [its] brief takes a passing shot at the issue." (quotation omitted)).

[3] The IJ and BIA rejected Petitioner's withholding of removal claim, reasoning that their failure to establish a claim for asylum necessarily means that they would be unable to meet the higher evidentiary standard for withholding. "Withholding of removal is available under 8 U.S.C. § 1231(b)(3) if the alien shows that it is more likely than not that her life or

11

IV.

Finally, Petitioners contend that they are entitled to CAT relief. They assert that the agency did not adequately analyze the CAT claim factors and did not sufficiently consider the evidence contrary to its ultimate decision. They further contend that the evidence compels the grant of CAT relief. The government counters that the agency properly considered Petitioners' CAT claims and that the evidence did not compel a contrary decision.

Under Article 3 of the CAT—to which the United States is a party—parties agree not to deport "a person to another State where there are substantial grounds for believing that [she] would be in danger of being subjected to torture." U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, art. 3, Dec. 10, 1984, 1465 U.N.T.S. 85, 114. An applicant for CAT relief bears the burden of "establish[ing] that it is more likely than not that he or she would be tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2). "For purposes of the CAT, torture includes only conduct by or at the instigation of or with the consent or acquiescence

---

freedom would be threatened in the country of removal because of her 'race, religion, nationality, membership in a particular social group, or political opinion.'" *Gomis v. Holder*, 571 F.3d 353, 359 (4th Cir. 2009) (quotations omitted). In other words, withholding claims carry a higher burden of proof than asylum claim but require the same facts to be proven. *Zelaya v. Holder*, 668 F.3d 159, 161 (4th Cir. 2012). For that reason, "an [applicant] who cannot meet [her] burden of proof on an asylum claim under the INA necessarily cannot meet [her] burden of proof on a withholding of removal claim under the INA." *Id.* (citation omitted). Because Petitioners did not satisfy the lower standard for asylum, they necessarily do not satisfy the higher standard for withholding of removal, and neither the IJ nor BIA erred in so finding.

12

of a public official or other person acting in an official capacity." *Mulyani v. Holder*, 771 F.3d 190, 200 (4th Cir. 2014) (simplified).  In assessing a CAT claim, the agency must consider all relevant evidence including, but not limited to:

> (i)      Evidence of past torture inflicted upon the applicant;
>
> (ii)     Evidence that the applicant could relocate to a part of the country of removal where he or she is not likely to be tortured;
>
> (iii)    Evidence of gross, flagrant or mass violations of human rights within the country of removal, where applicable; and
>
> (iv)     Other relevant information regarding conditions in the country of removal.

8 C.F.R. § 1208.16(c)(3)(i)–(iv).

Here, the BIA and IJ did not abuse their discretion.  "We presume that, in reaching their conclusions, the IJ and the BIA reviewed the evidence presented to them and made their decisions based on the relevant evidence." *Nolasco v. Garland*, 7 F.4th 180, 190 (4th Cir. 2021) (simplified).  The BIA and IJ "are not required to discuss every piece of evidence in the record, but they must announce their decisions in terms sufficient to enable a reviewing court to perceive that they have heard and thought and not merely reacted." *Id.* (quotation omitted).  In light of these standards, the agency properly considered Petitioners' evidence.  The IJ outlined the documents that Petitioners submitted in support of their applications and specifically noted that it "considered all the evidence in its entirety regardless of whether specifically mentioned in the text of this decision." A.R. 74.  It also explicitly acknowledged this evidence—albeit in the context of the asylum claims—noting that "[t]he documentary evidence in the record shows that the Government of Honduras has difficulty in prosecuting or controlling the gangs. . . .  Furthermore, there are sufficient

13

incidents of government impunity and corruption within Honduras." A.R. 81. The BIA also recognized Petitioners' country conditions evidence and explained that this evidence did not "overcome" the speculative nature of Petitioners' fear of torture. A.R. 5. In short, the IJ and BIA's decisions regarding the CAT claims could have been more thorough, but neither abused their discretion.

Additionally, the evidence does not compel a conclusion contrary to the one that the agency reached. As discussed above, the record here is thin: Larios faced two unfulfilled threats from a gang member and quickly gave up on seeking police assistance. The agency reasonably concluded that these facts did not amount to past torture or support a fear of future torture, and even if they did qualify as torture, Petitioners' claim that the government would acquiesce or consent to their mistreatment was too speculative to warrant relief. *See Hernandez-Cabrera v. Barr*, 837 F. App'x 148, 155 (4th Cir. 2020) (holding that CAT relief was unavailable when "the evidence left the IJ to speculate as to whether efforts to seek help from law enforcement in the future would be ignored or otherwise ineffective"). Moreover, the evidence does not establish that Petitioners themselves faced or would face a particularized risk of torture. *See Singh v. Holder*, 699 F.3d 321, 335 n.16 (4th Cir. 2012); *see also Nolasco*, 7 F.4th at 191 ("[T]he mere existence of a pattern of human rights violations in a particular country does not constitute a sufficient ground for finding that a particular person would more likely than not be tortured.") For these reasons, we deny the petition as to the CAT determination, as well.

V.

For the foregoing reasons, Petitioners' petitions for review are denied.

*PETITIONS FOR REVIEW DENIED*