**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 24-1490**

YAMILET DEL CARMEN GARCIA CHAVEZ; G.D.B.G.,

Petitioner,

v.

PAMELA JO BONDI, Attorney General,

Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued: March 20, 2025                          Decided: May 7, 2025

Before NIEMEYER, AGEE, and THACKER, Circuit Judges.

Petition for review granted; order of removal vacated; and remanded for further proceedings by unpublished per curiam opinion.

**ARGUED:** Mary Elizabeth Dato Reed, HATCH ROCKERS IMMIGRATION, Durham, North Carolina, for Petitioners. Madeline Henley, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent. **ON BRIEF:** Evelyn R. G. Smallwood, HATCH ROCKERS IMMIGRATION, Durham, North Carolina, for Petitioners. Brian Boynton, Principal Deputy Attorney General, Sabatino F. Leo, Assistant Director, Greg D. Mack, Senior Litigation Counsel, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

2

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Yamilet Del Carmen Garcia Chavez ("Petitioner"), a native and citizen of El Salvador, petitions for review of the final order of the Board of Immigration Appeals ("BIA") denying her, and her minor son, all relief from deportation. The BIA upheld the finding of an immigration judge ("IJ") that Petitioner failed to establish that the Salvadoran government was unwilling or unable to protect her from persecution. Because the BIA failed to adequately explain its decision, we grant Petitioner's petition and remand the case for further proceedings.

## I.

For decades, Petitioner suffered extensive and repeated abuse at the hands of Abuid Hernandez Gonzalez ("Hernandez Gonzalez"), a former classmate. In May 2001, when Petitioner was only nine years old, Hernandez Gonzalez began to make advances toward Petitioner by asking her to be his girlfriend or go on dates with him. Petitioner repeatedly refused because of Hernandez Gonzalez's ties to the 18 Revolutionaries gang, which was rampant in El Salvador. In June of the same year, Hernandez Gonzalez dropped out of school to officially join the gang. He persisted in pursuing Petitioner despite her repeated rejections. *See* J.A. 205 ("Hernandez Gonzalez kept pushing and waiting for me when I finished school every day.").[1] In May 2002, Hernandez Gonzalez continued to coerce Petitioner into dating him by threatening her father and brothers. *See id.* ("He started to threaten my father and brother, he told them they were going to have a lot of problems with

---

[1] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

3

the gang if I did not have a relationship with him."). After this threat, Petitioner's family became worried about her contact with Hernandez Gonzalez because they believed he was dangerous. As a result, in order to remove Petitioner from Hernandez Gonzalez's grasp, they sent her to live with her aunt for four months and only allowed her to return home when Hernandez Gonzalez was imprisoned. Three years later, in 2005, Petitioner encountered a newly released Hernandez Gonzalez at a street market. *See id.* at 206 ("At the beginning of 2005, one day I went to the market with my mother and felt someone grab my arm. When I turned around it was [Hernandez Gonzalez]."). A few days later, Hernandez Gonzalez assaulted Petitioner's family:

> A group of men came to my house, they had ski masks and were armed. They came in and beat my brothers and my parents. [Hernandez Gonzalez] had his face uncovered. He told me that [these] were the consequences of my rejection and that I had to go with him because if not he would kill my family.

*Id.*

To protect her family, Petitioner went with Hernandez Gonzalez. She was fifteen years old at the time. After abducting her from her family home, Hernandez Gonzalez blindfolded Petitioner and brought her to a house in an undisclosed location. Hernandez Gonzalez then held Petitioner prisoner for over a year in a windowless, locked room containing only a bed and a bathroom. According to Petitioner, Hernandez Gonzalez "would always beat me. There was never a normal day. I didn't even know if it was day or night. I didn't go out." J.A. 120. During this time, Hernandez Gonzalez proceeded to repeatedly rape and beat Petitioner at gunpoint, threatening to shoot her if she resisted. *See id.* at 122 ("When he would come, he would arrive and wanted to rape me. And my

4

rejection was constant. He would put his gun on my head. He would threaten me and said that he was going to kill my parents."). When Petitioner was sixteen years old, Hernandez Gonzalez impregnated her. He only allowed her to leave the house for prenatal appointments, which he did not allow her to attend alone, and he prevented her from speaking with anyone at these appointments. *See id.* at 120 ("[W]hen I was pregnant, he would take me to the doctor but he would be very careful that I would not talk to anyone. I could never say anything because of fear."). When the baby was born, Hernandez Gonzalez took Petitioner to the hospital and registered the child, a son, in his name. Upon discharge from the hospital, Hernandez Gonzalez "locked [Petitioner] in the room again." *Id.* at 123.

When Petitioner's child was a few months old, Hernandez Gonzalez kicked Petitioner and the baby out but informed her that he would always be watching her and ensuring she was abiding by his rules. *See* J.A. 124 ("He would send his friends to tell me they were vigilant of me. That I could not talk to anyone. And I could not maintain a relationship with anyone or a friendship."). Petitioner was left stranded, with a newborn, on the street alone. She was forced to walk back to her parents' house, which was hours away.

A few months after being released from captivity, Petitioner was speaking to a former classmate, Dani, at a street market, where she was observed by Hernandez Gonzalez's friends. When Hernandez Gonzalez's friends saw Petitioner speaking to Dani, they beat her and left her bleeding on the ground. *See* J.A. 124 ("I re-encounter [*sic*] at the fair with [Dani]. [Hernandez Gonzalez's] friends saw me talking to him, and when I was

5

leaving the fair his friends beat me. They left me bleeding on the ground."). The police witnessed this beating and Petitioner made a report. *See id.* at 207 ("The policemen who looked after the fair, when they heard rumors that they were hitting someone in the alley, arrived and took my statement. They asked me if I had an idea who [it] could be, and I told them that it was orders from my son's father, and we made the report."). But the police did nothing in response. *See id.* at 124 ("People made rumors and the police from the fair came to where I was being beaten. In that occasion, they made a report and I made the denouncement, but nothing happened."); *see also id.* ("Then the police didn't do anything.").

In the summer of 2007, Petitioner started a relationship with Dani. Two years later, they moved in together to a house about thirty minutes away from Petitioner's parent's house. For the next five months, Hernandez Gonzalez repeatedly went to Petitioner's parent's house searching for her. Eventually, Hernandez Gonzalez tracked Petitioner down and showed up at her and Dani's home with a gun. He told Petitioner that he would kill her if she did not leave with him and return, with their son, to her previous captivity. *See* J.A. 208 ("[Hernandez Gonzalez] showed up at my house. It was about 9 in the morning when he showed up and started insulting me. He took out a gun and told me that he would kill me if I did not go with him and leave Dani."). Hernandez Gonzalez only stopped beating Petitioner when their son came out of the house. As he left, Hernandez Gonzalez warned that he would come back for Petitioner and her son. *See id.* at 127 ("He told me that was for me hav[ing] not obeyed him. That I could not have a relationship with anyone. And he left me my son, but he told me that I had to leave Dani."); *see also id.* at 208

6

(Hernandez Gonzalez "left the house and told me he would come back for me and my son.").

That same day, Dani and Petitioner fled to a nearby town. There, Petitioner gave birth to her second child, another son. Dani is the father of this child. A week after the birth of her second child, Hernandez Gonzalez found Petitioner's safe house and arrived there with four armed men to threaten Dani. *See* J.A. 131 ("[Hernandez Gonzalez] said that he was going to kill Dani, and that I could not be with anyone; that I had to go with him."). Hernandez Gonzalez and his men began beating Dani and threatening him at gunpoint. *See id.* at 209 ("[Hernandez Gonzalez and his men] locked us in the house and put a gun to Dani's head and told me that he was going to kill him because I did not obey since I did not leave Dani."). Hernandez Gonzalez and his men "kept hitting [Dani] and shot him in the leg." *Id.* Petitioner began to leave with Hernandez Gonzalez, but Hernandez Gonzalez's friends convinced him to let her stay. Dani was rushed to the hospital where his family filed a report with the police but, again, "nothing ever happened." *Id.* at 133; *see id.* at 209 ("At the time that Dani entered the hospital the police report was made, but they never did anything about it."). Dani then fled to the United States.

After this, Petitioner moved back into her family home for protection. However, yet again, Hernandez Gonzalez arrived at her family home and tried to take her away. To prevent this abduction, Petitioner's uncle and cousin physically fought Hernandez Gonzalez. Within a couple days, Petitioner's uncle and cousin were shot and killed. The police were made aware of these murders but again failed to respond. *See* J.A. 136 ("Those assassinations were even in the news. And until today, he is still free. Nothing was ever

7

done; and people who saw didn't want to talk. There were some witnesses, but no one wanted to say anything because of the same fear, and because the police did not do anything to detain him.").

Hernandez Gonzalez continued to monitor Petitioner, ensuring that she was abiding by his rules of not speaking to anyone outside of her family. On September 13, 2014, Hernandez Gonzalez arrived at Petitioner's home in a crazed state.

> [H]e came like crazy to the house. He beat me again and put me in his car, and he took me to a town that was approximately four or five hours from where I lived. He raped me and made me have sexual relations with his friends. There were four and [with] him there were five. He left me injured and they left.

J.A. 133.

Petitioner was only able to flee this assault with the help of a neighbor who heard her screams for assistance.

> There was a window where I had been left, and I broke it. And a female neighbor from the house saw that I got my hand out and that I was screaming, and she called another person. And they broke the door so that I could get out. That same lady gave me money to go back to my parent's house. When I arrived home, my parents brought me to a private clinic, and the next day I was – I was put into a car and brought to Guatemala.

J.A. 133.

A few days after Petitioner arrived in Guatemala, the neighbor who helped her flee the house where she was gang raped was murdered. Petitioner then fled to the United States.

Petitioner arrived in Texas on October 3, 2014, and requested asylum at the border. Petitioner demonstrated a credible fear of persecution, explaining "I was taken as property without my consent." J.A. 116. Because Petitioner entered the country without valid entry documents, the Department of Homeland Security filed a Notice to Appear finding Petitioner subject to removal pursuant to 8 U.S.C. § 212(a)(7)(A)(i)(I). On February 7, 2018, Petitioner submitted an application requesting asylum, withholding of removal, or relief pursuant to the Convention Against Torture ("CAT"). Petitioner also requested relief for her two minor children. On April 29, 2019, the IJ denied Petitioner and her two minor children all relief. Although the IJ relied on multiple grounds for its decision, the one that is relevant to this appeal was its determination that Petitioner was "unable to meet her burden of proof to corroborate her specific claim" that the Salvadoran government could not control Petitioner's abuser. J.A. 58.

On May 22, 2019, Petitioner appealed the IJ's decision to the BIA, raising multiple grounds. On May 2, 2024, the BIA issued a three member decision affirming the IJ's finding that Petitioner cannot demonstrate that the Salvadoran government is unable or unwilling to control Hernandez Gonzalez. J.A. 4 ("As the respondent did not demonstrate that the harm suffered or feared would be inflicted by the government or by actors the government is unable or unwilling to control, she is not eligible for asylum or withholding of removal."). Because that determination was dispositive of the petition, the BIA declined to address any other issues.

Petitioner timely filed a petition for review of the BIA decision.

9

## II.

In reviewing decisions of the BIA, we treat factual findings as "conclusive unless the evidence was such that any reasonable adjudicator would have been compelled to a contrary view," and we uphold the agency's determinations "unless they are manifestly contrary to the law and an abuse of discretion." *Portillo Flores v. Garland*, 3 F.4th 615, 625–26 (4th Cir. 2021) (internal quotations omitted). The agency abuses its discretion if it fails to offer a reasoned explanation for its decision or if it distorts or ignores important parts of an applicant's claim. *Tassi v. Holder*, 660 F.3d 710, 719 (4th Cir. 2011); *see also Cordova v. Holder*, 759 F.3d 332, 338 (4th Cir. 2014) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.") (citations omitted). Further, "when a BIA order does not demonstrate that the agency has considered an issue, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Nken v. Holder*, 585 F.3d 818, 822 (4th Cir. 2009) (internal quotations omitted).

## III.

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum and withholding of removal to eligible applicants. 8 U.S.C. § 1158(a)(1). To qualify, an applicant must demonstrate that she is unable or unwilling to return to her native country because of persecution or a well founded fear of persecution. *Id.* § 1101(a)(42)(A). When an applicant claims that she fears persecution by a private actor, she must also show that the government in her native country "is unable or unwilling to control" her persecutor.

*Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949 (4th Cir. 2015).  Whether a government is "unable or unwilling to control" a private actor "is a factual question that must be resolved based on the record in each case." *Crespin-Valladares v. Holder*, 632 F.3d 117, 128 (4th Cir. 2011) (internal quotations omitted).

## A.

Here, Petitioner challenges the BIA's determination that El Salvador is willing and able to control Hernandez Gonzalez and prevent him from perpetuating further abuse.  Petitioner challenged this finding before the BIA by arguing that the IJ erroneously conflated the governmental control and particular social group asylum elements.  Before us, Petitioner argues that the BIA erred by conflating the governmental control element with the requirement that Petitioner establish a well founded fear of persecution.  Petitioner argues that this conflation resulted in the BIA failing to meaningfully consider Petitioner's evidence proving that El Salvador is unwilling and unable to control Hernandez Gonzalez.  Because Petitioner alleged two different elements were erroneously conflated before the BIA and this Court, the Government argues that Petitioner's present challenge to the BIA's treatment of the governmental control asylum prong has been waived.  Not so.

The INA has an exhaustion requirement.  *See* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if the [noncitizen] has exhausted all administrative remedies available to the [noncitizen] as of right.").  This requirement of exhaustion "while not jurisdictional, is nonetheless mandatory." *Lopez-Benitez v. Garland*, 91 F.4th 763, 769 (4th Cir. 2024).  A petitioner exhausts her administrative remedies by raising an argument challenging the IJ's decision before the BIA.  *Cabrera v. Barr*, 930 F.3d 627, 631 (4th Cir.

11

2019).  The failure to exhaust a claim, i.e. raise that claim before the BIA, constitutes waiver of that claim.  Therefore, arguments that a petitioner did not raise before the BIA are waived and the Court lacks jurisdiction to consider them.  *Id.*

We have held that a petitioner exhausts her administrative remedies, thereby preserving a claim, when the BIA issues a definitive ruling on the issue raised in the petition for review.  This is so even where the BIA does so sua sponte, without the petitioner raising that issue before the BIA.  *See Portillo Flores v. Garland*, 3 F.4th 615, 633 (4th Cir. 2021).  Further, we have explained that a petitioner "need not conjure up magic words" to raise an issue before the BIA.  *Id*. at 632 (internal quotations omitted) (citation omitted).  Because the exhaustion requirement only bars consideration of general issues that were not raised below, a petitioner should not be penalized by evaluating form over substance where her arguments before the BIA in essence raised the claim at issue.  *Id.*

Here, the BIA "issued a definitive ruling on the issue raised in the petition for review."  *Perez Vasquez v. Garland*, 4 F.4th 213, 228 (4th Cir. 2021) (quoting *Cabrera*, 930 F.3d at 631).  In her briefing before the BIA, Petitioner did not raise the issue that the governmental control and well founded fear prongs were erroneously combined.  Instead, in that briefing, Petitioner argued that "the IJ erroneously conflates the separate consideration of government protection within his [particular social group] analysis which is clear error."  J.A. 26.  Significantly, Petitioner also stated that she "believes that her testimony and country conditions evidence is sufficient enough to prove that the Salvadoran government was unable or unwilling to protect her in El Salvador and the IJ's finding should be overturned based on the evidence submitted."  *Id.* at 29.

12

The BIA ruled directly, and solely, on the issue of whether El Salvador was able and willing to control Petitioner's abuser. *See* J.A. 4 ("As the respondent did not demonstrate that the harm suffered or feared would be inflicted by the government or by actors that the government is unable or unwilling to control, she is not eligible for asylum or withholding of removal."). Therefore, the BIA considered and decided the governmental control issue and "the Government cannot now fault Petitioner for not parsing her appellate claims in a manner the IJ did not [himself] see fit to do." *Portillo Flores*, 3 F. 4th at 632.

Therefore, we hold that Petitioner has exhausted her claim that the BIA did not properly address whether El Salvador was able and willing to control her abuser, and that question is ripe for review.

B.

Before the BIA, Petitioner argued that El Salvador was unwilling and unable to control Hernandez Gonzalez on the basis of her own testimony, country conditions evidence demonstrating rampant gendered crimes against women, and documentary evidence demonstrating her injuries after being gang raped. Petitioner detailed the abuse she suffered and repeatedly testified that she, as well as her family, sought help from the Salvadoran police. *See* J.A. 119 ("I called the police in various occasions, but they never did anything."); *see also id.* at 132 (explaining that Dani's family called the police after Hernandez Gonzalez shot Dani in the leg for beginning a relationship with Petitioner); *id.* at 163 ("I did go to the police many times"); *id.* at 164 ("I [went to the police] when I was beaten at the fair in 2010."); *id.* at 136 (explaining that the police were aware of her uncle

13

and cousin's murder but refused to do anything). Petitioner also introduced a medical record from the clinic she visited after being gang raped and provided a news article detailing the death of her uncle and cousin. Based on this evidence, the IJ found Petitioner's testimony to be credible. Nonetheless, the IJ declined to grant relief, finding that Petitioner had not sufficiently demonstrated El Salvador's unwillingness or inability to protect Petitioner from further abuse.

In affirming this denial of relief, the BIA issued a perfunctory opinion in which it failed to engage with Petitioner's testimony and documentary evidence. In finding that Petitioner did not establish that El Salvador was unwilling or unable to control Hernandez Gonzalez, the BIA said only:

> The Immigration Judge found that societal norms and prosecutorial impunity contribute to a reduced level of protection for female victims of violence in El Salvador. The Immigration Judge noted that the government's efforts to curb gender-based violence and gang violence is an open and ongoing question, and that the respondent did not provide sufficient evidence for the Immigration Judge to conclude that the government is unable or unwilling to control perpetrators of these crimes.

> The respondent's contention that her testimony and country conditions evidence is sufficient to meet her burden of proof does not suffice to demonstrate any clear error in the Immigration Judge's finding that the government is not unable or unwilling to protect her. Where, as here, there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. As the respondent did not demonstrate that the government is unable or unwilling to control, she is not eligible for asylum or withholding of removal.

J.A. 4.

14

As we have explained, an applicant for asylum is "entitled to know that agency adjudicators reviewed all her evidence, understood it, and had a cogent, articulable basis for its determination that her evidence was insufficient." *Orellana v. Barr*, 925 F.3d 145, 153 (4th Cir. 2019) (cleaned up); *see also id.* (quoting *Baharon v. Holder*, 588 F.3d 228, 233 (4th Cir. 2009) ("Those who flee persecution and seek refuge under our laws have the right to know that the evidence they present . . . will be fairly considered and weighed by those who decide their fate.")). Here, the BIA's opinion fell far short of those expectations. Petitioner submitted evidence that she repeatedly attempted to invoke the assistance of the Salvadoran police but was met with inaction. And both the BIA and the IJ's opinions "repeatedly failed to offer specific, cogent reasons for disregarding the concededly credible, significant, and unrebutted evidence that Petitioner provided." *Orellana*, 925 F.3d at 152 (quoting *Tassi v. Holder*, 660 F.3d 710, 722 (4th Cir. 2011)).

The BIA abused its discretion by arbitrarily ignoring this unrebutted legally significant evidence. *See Hernandez-Avalos v. Lynch*, 784 F.3d 944, 951 (4th Cir. 2015) ("[A]n IJ is not entitled to ignore an asylum applicant's testimony in making . . . factual findings."). To rectify this error, the BIA must consider Petitioner's proffered testimonial, and documentary, evidence. Petitioner testified that she contacted the police after Hernandez Gonzalez shot Dani in the leg, after she was beaten at the fair, after her uncle and cousin were murdered, and after she escaped her year of captivity. The BIA must analyze this evidence and explain whether such evidence is insufficient to demonstrate that the Salvadoran government is unwilling and unable to control Hernandez Gonzalez.

15

The BIA must also address Petitioner's wealth of country conditions evidence. Specifically, Petitioner submitted reputable articles demonstrating the rampant violence against women in El Salvador. These articles explain how young women in El Salvador are treated as property, often claimed by gang members, and how the police in El Salvador lack the means to protect, or rescue women, from this harm. *See* J.A. 243 (United States Department of State OASC, El Salvador 2018 Crime & Safety Report (2018)); *see also id.* at 264 (Nina Lakhani, *It is a crime to be young and pretty: girls flee predatory Central America gangs,* THE GUARDIAN (Nov. 23, 2016)); *id.* at 282 (*Is Deportation a Death Sentence for Salvadoran Women and Girls?*, NEWSWEEK (Jan. 16, 2018)). The articles also explain how gang members use threats against family members as a means of coercion to force women into unwanted relationships. *See id.* at 264 ("Increasing numbers of women and girls are fleeing El Salvador amid mounting evidence that criminal gangs are systematically targeting adolescent girls as sexual slaves."); *see also id.* (describing gang leader's statement and saying, "he said no women had ever turn him down, and if I refused to be his girlfriend, he would kill me and my family."); *see also id.* at 265 (describing experience of another young women targeted by the 18 Revolutionaries gang who explained: "every time I got on the bus [the gang member] would be there, shouting that I was his girlfriend. Then he sent guys to watch me. If they saw me talking to male friends, they'd tell them to back off, so I stopped going to college."). On remand, the BIA should address this evidence as part of its evaluation of the Government of El Salvador's willingness and ability to protect Petitioner. *See Orellana*, 952 F.3d at 153 (quoting *Aliyev v. Mukasey*, 549 F.3d 111, 119 (2d Cir. 2008)) ("When an applicant offers unrebutted

16

evidence that 'despite repeated reports of violence to the police, no significant action was taken on [her] behalf,' she has provided 'ample ground' to conclude 'that the BIA was not supported by substantial evidence in its finding that [she] did not show that the government was unwilling to protect [her] from private persecution.'").

Here, the BIA erred because it failed to provide the required reasoning for its determination that Petitioner did not demonstrate the Government of El Salvador's unwillingness, or inability, to protect her from her abuser. On remand, before the BIA can rely on this ground as a basis for denying relief, it must consider the relevant, credible record evidence and articulate the basis for its decision.[2]

## IV.

For the foregoing reasons, we grant the petition for review, vacate the BIA's affirmance of the order of removal, and remand for further proceedings consistent with this opinion.

*PETITION FOR REVIEW GRANTED; ORDER OF REMOVAL VACATED; AND*
*REMANDED FOR FURTHER PROCEEDINGS*

---

[2] Petitioner also challenges additional grounds given by the IJ, but not relied on by the BIA as a basis for denying her claim. Because the BIA did not address these grounds, we do not address them either. *See Mulyani v. Holder*, 771 F.3d 190, 196 (4th Cir. 2014) ("[R]eview of an IJ decision is permissible only to the extent that the BIA adopted it."); *Martinez v. Holder*, 740 F.3d 902, 908 & n.1 (4th Cir. 2014). Of course, the BIA may take these up on remand as appropriate or necessary to consider Petitioner's claims.

17